**Claude HOLLAND, Appellant,**

v.

**ATTORNEY GENERAL OF NEW JERSEY.**

No. 84–5895.

United States Court of Appeals, Third Circuit.

Argued Sept. 27, 1985.

Decided Nov. 22, 1985.

David A. Ruhnke, West Orange, N.J., for appellant.

George L. Schneider, Essex County Prosecutor, Elizabeth A. Duelly, Asst. Essex County Prosecutor (argued), Newark, N.J., for appellee.

Before GIBBONS, SLOVITER and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellant Claude Holland was convicted of multiple counts including armed robbery and assault with intent to kill in the New Jersey Superior Court. The Appellate Division of the New Jersey Superior Court affirmed the conviction and the New Jersey Supreme Court refused his petition for certification. Having exhausted his state remedies, Holland filed a petition for a writ of habeas corpus in the District Court for the District of New Jersey, where he claimed a violation of the federal constitutional rights due him under the doctrine enunciated in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The district court denied the writ on the ground that the error was harmless. We cannot agree and therefore reverse the judgment of the district court.

### I.

#### Facts and Procedural History

Shortly after midnight on May 1, 1974, three masked black men broke into a home in Short Hills, New Jersey, tied up the occupants, threatened them with a shotgun and ice pick, and stole about $10,000 worth of valuables. None of the occupants was able to identify any of the intruders.

Police Officer Wade of the Millburn Police Department was on patrol duty near the Short Hills railroad station watching traffic, about three-quarters of a mile from the scene of the robbery. At 1:07 a.m. he noticed a white Volvo with a missing headlight, and followed it. A green Buick in front of it then drove through a red light in making a right turn. Officer Wade pursued and stopped the Buick. Officer Wade noticed two people in the front seat and walked to within four to five feet of the car on the driver's side. As Officer Wade waited for the occupants to respond to his request for license and registration, a third occupant in the back seat, whom he had not seen before, thrust the muzzle of a sawed-off shotgun out the back window, and told Officer Wade to freeze. Officer Wade

ducked and ran back toward his squad car. After he heard a shot, he fired two shots at the Buick. The car sped away, and Officer Wade followed. Shortly thereafter he found the car abandoned. Among the items found near or in the Buick were a shotgun, items stolen during the robbery, a wallet containing the driver's license of Clifford English, and various pieces of clothing used in the robbery. No suspects were apprehended at the scene.

Later that morning, Officer Wade accompanied New York City police officers to Brooklyn. They located Clifford English, and after Officer Wade identified English as the car's driver, English was taken into custody. Three or four days later, Officer Wade viewed several hundred pictures in the I.D. Bureau in New York City, but made no identification of any other suspect.

Two years later, in the summer of 1976, Shirley Payton, who was living in Chicago, called the New York City Police Department and implicated her husband, Richard Payton, in various crimes in the New York and New Jersey area. Payton was arrested by the Chicago police at New York's request, and Payton confessed a number of crimes, including the Short Hills robbery, to Detective John Daly of the New York City Police Department. Payton implicated Claude Holland as well as Clifford English in the Short Hills robbery.

In August 1976, Officer Wade went to New York to view a lineup containing suspects of the robbery, but the lineup was not held. Instead, it was arranged to have the New York police send photographs. In October 1976, Officer Wade viewed a four-photograph spread and identified the pictures of Holland and Payton as the front seat and back seat passengers respectively of the green Buick he had stopped on May 1, 1974.

Holland and Payton were scheduled to be tried together. Prior to trial, Holland's attorney moved for a severance, and contended that admission against Payton of Payton's confessions to his wife and to Detective Daly which inculpated Holland would contravene the holding in *Bruton v.*

*United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Bruton*, the Supreme Court held that a defendant's Sixth Amendment right to confrontation is violated by the admission of a co-defendant's extra-judicial confession implicating the defendant. The trial judge denied the motion to sever. Before trial, the court held a *Bruton* hearing, and ruled that references to Holland could be effectively excised.

■ A *Bruton* error occurred during the trial when Detective Daly, in response to a question by Payton's defense counsel, testified that "[Shirley Payton] had told me that Richard Payton and Claude Holland and ... Clifford English were involved in a house robbery in New Jersey." App. at 954A. Since Shirley Payton's statement was based on Richard Payton's confession to her, and Richard Payton was unavailable for cross-examination because he did not testify, this testimony contravened both the letter and spirit of the *Bruton* decision.

Holland objected immediately. After a brief side bar discussion, the trial court dismissed the jury and held further discussions on the issue that afternoon and the next morning. Thereafter, the trial court denied Holland's motion for a mistrial. The court stated it was satisfied that the testimony by Detective Daly was due to inadvertence and that there was no intention to violate the court's order. The court also stated that it could give an appropriate instruction to the jury to disregard the testimony, and the jury would follow that instruction. It reserved to Holland the right to reapply for a mistrial at the trial's end.

After lunch, the jury was recalled and, with consent of counsel, was told that:

Now, it appears that Officer Daly was confused about the last question asked him yesterday by Mr. Clancy and as a result there was some confusion concerning Officer Daly's answer to that question.

Therefore, I instruct you that you, ladies and gentlemen, are to completely

disregard for any purpose whatsoever Officer Daly's confused answer.

App. at 1011A–12A. The trial, which had been recessed for 24 hours beginning immediately after Detective Daly's testimony that Shirley Payton had implicated Holland, then resumed.

A week later, during the prosecutor's summation, Holland held a note stating, "God is my judge, I've done no wrong", in the direction of the jury. App. at 1351A. The court questioned each juror separately about whether the juror saw the note, whether the note would affect the juror's consideration of the case, and whether the juror would be able to decide the case only upon the evidence heard in the courtroom. The court concluded that the jurors had not been affected by the note and that they would be able to decide the case solely on the evidence before them.

The jury convicted both Holland and Payton. Holland's motion for a new trial was denied by the trial judge. The New Jersey Appellate Court affirmed the convictions, holding, *inter alia,* that the *Bruton* error was "at most harmless error". In denying the petition for a writ of habeas corpus on the basis of the *Bruton* error, the district court also ruled that the error was harmless beyond a reasonable doubt because "the independent evidence of petitioner's guilt was in fact overwhelming." App. at 16A.

## II.

### *28 U.S.C. § 2254(d)*

■ The district court suggested that there was a "presumption of correctness" under 28 U.S.C. § 2254(d) applicable here. We turn to that issue first.

Section 2254(d) requires that a federal court deciding an application for a writ of habeas corpus must accord a presumption of correctness to "a determination after a

hearing on the merits of a factual issue, made by a State court of competent jurisdiction," 28 U.S.C. § 2254(d) (1982), unless one of the eight exemptions set forth in that section is relevant.

The scope of § 2254(d) has been elucidated in a series of recent Supreme Court decisions. The Court has applied the § 2254(d) presumption of correctness to state court factual findings that a prospective juror was properly excluded for cause, *Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 853–55, 83 L.Ed.2d 841 (1985); that a juror's *ex parte* communications with the court did not affect the jury's impartiality, *Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (per curiam); that an individual juror was impartial, *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 2891–93, 81 L.Ed.2d 847 (1984), and *Smith v. Phillips,* 455 U.S. 209, 213–14, 218, 102 S.Ct. 940, 944, 946, 71 L.Ed.2d 78 (1982); that a defendant was competent to stand trial, *see Maggio v. Fulford,* 462 U.S. 111, 117, 103 S.Ct. 2261, 2264, 76 L.Ed.2d 794 (1983); that a defendant's plea in an earlier proceeding was knowingly and intelligently made, *Marshall v. Lonberger,* 459 U.S. 422, 430–37, 103 S.Ct. 843, 849–52, 74 L.Ed.2d 646 (1983); and that witnesses identifying a defendant as participating in a prison murder were not unduly influenced by investigating officers, had an adequate opportunity to view the crime, and proffered accurate descriptions, *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982); *see also Sumner v. Mata,* 449 U.S. 539, 543, 552, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981).

The Court has noted that "[i]t will not always be easy to separate questions of 'fact' from 'mixed questions of law and fact' for § 2254(d) purposes," *Wainwright v. Witt,* 105 S.Ct. at 855.[1] In *Patton v.*

---

1. In *Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 853–55, 83 L.Ed.2d 841 (1985) and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984), the Court reaffirmed its earlier holding that mixed questions of law and fact are not subject to the § 2254(d)

presumption of correctness. Although we stated otherwise in *Patterson v. Cuyler,* 729 F.2d 925, 930–32 (3d Cir.1984), and *Miller v. Fenton,* 741 F.2d 1456, 1461–62 (3d Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985), whether the findings at issue in

*Yount,* the Court explained that the question of the partiality of an individual juror is not one of mixed law and fact. Rather it is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed....

. There are good reasons to apply the statutory presumption of correctness to the trial court's resolution of these questions. First, the determination has been made only after an often extended *voir dire* proceeding designed specifically to identify biased veniremen. It is fair to assume that the method we have relied on since the beginning ... usually identifies bias. Second, the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to "special deference." ... The respect paid such findings in a habeas proceeding certainly should be no less....

104 S.Ct. at 2891–92 (citations and footnotes omitted).

The "findings" to which the district court thought the presumption of correctness applied are not analogous to those at issue in *Patton v. Yount* or any of the other cases in which the Court applied § 2254(d). The "findings" appear in two contexts.

those cases fall within the Court's expanded definition of "findings of fact" may be clarified this term, since the Supreme Court has granted certiorari in *Miller.*

2. The court's inquiry is illustrated by the following colloquy:
   THE COURT: Mrs. Best, it has come to my attention that the defendant Claude Holland held up a note during the course of Mr. Rosenfeld's summation. Did you see that note?
   MRS. BEST: Yes, I did.
   THE COURT: Were you able to read it?
   MRS. BEST: Yes, I was.
   THE COURT: Did you discuss that note with any of the other jurors?
   MRS. BEST: Yes, I have.
   THE COURT: To what extent?

First, at the time that the *Bruton* error was called to the state trial court's attention by Holland, the court stated:

I am satisfied at this time based upon my observations, my communications and my experiences with this jury during the course of this trial that this jury has the ability to follow instructions given to the jury by this Court and that upon an appropriate instruction being given to the jury to disregard for any purposes the testimony in question, the jury *will follow that instruction and such testimony will not contribute to any verdict rendered by the jury in this case.*

App. at 1001A–02A (emphasis added).

Second, when the note held by Holland during the summation was called to the court's attention, the court held an individual voir dire of each juror on the issue of the note.[2] The summation was then permitted to resume. Thereafter, when Holland renewed his motion for a new trial on, *inter alia,* the *Bruton* issue, the court explained again the basis of its prior ruling, stating:

At the end of the trial during summations the defendant Claude Holland held up a sign to the view of the jurors telling the jurors that he was innocent or some other words of similar import. As a result I declared a recess and at the request of all counsel I spoke to each of the jurors individually. That experience gave me an opportunity to speak with the jurors nose to nose so to speak and to gain some insight as to how they were

MRS. BEST: We just were saying had we seen it, that's all, had everyone seen it.
THE COURT: That was the extent of the conversation?
MRS. BEST: That was it.
THE COURT: Will that note have any effect on you at all in this case?
MRS. BEST: No.
THE COURT: Will you be able to, Mrs. Best, put that aside and decide this case only upon the evidence you're going to hear in this courtroom?
MRS. BEST: Yes, I will.
THE COURT: All right, thank you.
Please don't discuss with the other jurors what we just talked about.
App. at 1363A–64A.

reacting to the trial. All counsel were present when I spoke to each of the jurors, all of the jurors I think except two readily admitted not only seeing the sign but discussing it with the other jurors and told me basically what they had talked about. I then asked each of the jurors whether they could disregard what had been done and each of the jurors quite readily assured me they could. I was impressed not so much by what they said but the manner in which they said it, their demeanor at the time that I spoke with them, I detected no anger or hostility or any other ill feelings toward the defendant Holland. *I was convinced at that point that these jurors were going to decide this case based on the evidence before them and I became even more certain after that experience that the corrective charge I gave concerned [sic] a Bruton problem was sufficient.*

Ra at 43–44 (emphasis added).

The district court, apparently referring to these two statements by the trial court, stated:

Here too, the trial court, and the appellate court after it, found that the jury was, in fact, able to follow a jury instruction promptly given and corrected by proper testimony. The trial court's conclusion, based upon a unique opportunity to question each juror, is supported by the record presented to this court. Nor has petitioner borne his burden of rebutting the presumption of correctness which attends the ruling of a trial court which is in a far better position than is this court to evaluate the jury's processes.

App. at 18A.

Unlike the district court, we see no finding of historical fact. It is evident that the court's first ruling, that the jury "will follow" its instruction and that such testimony "will not contribute to any verdict", is not a finding of historical fact but is merely a prediction. Although a finding of juror bias or absence of bias is often framed in terms of whether a juror will be able to set aside his or her own opinion and render a verdict based on the evidence, in effect a trial court's determination on the bias of a juror is a determination based on the juror's present state of mind. As the Court stated in *Wainwright v. Witt*, "whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind." 105 S.Ct. at 854. In contrast, the trial court's statement that the jury will follow its instructions reflected merely its opinion.

Nor does the trial court's second statement contain any "findings" that fall within § 2254(d). Unlike *Patton v. Yount* where the voir dire focused on the impact of the pretrial publicity, the subject of the state court's findings, here the only voir dire that was conducted related to the effect of Holland's note. The trial court's determination of credibility and demeanor was not made in the context of any inquiry on the *Bruton* error. Since the court failed to question the jury on the impact of the *Bruton* evidence, it could make no § 2254(d) "finding ... based upon [a] determination[ ] ... of credibility." *Wainwright v. Witt*, 105 S.Ct. at 854. At most, what we have is an expression by the trial court of its confidence in the integrity of the jurors. Although that may have been based on the court's observation, it is not a finding of historical fact to which a federal court must give deference. In light of the absence of any voir dire on the impact of the *Bruton* error, we need not decide whether that is the type of finding encompassed by § 2254(d).

Finally, the trial court relied in large part on the value of its "curative instruction." In *Bruton v. United States*, the Court held that a trial court's limiting instructions to the jury are insufficient protection because there is a great risk that the jury will not or cannot follow those instructions. 391 U.S. at 135, 88 S.Ct. at 1627. In any event, we conclude that § 2254(d) is inapplicable here because there were no determinations made to which a presumption of correctness must be accorded.

### III.

### The Harmless Error Issue

The district court stated, "[p]etitioner claims, and the state does not dispute, that [the testimony of Detective Daly] constituted a *Bruton* violation." App. at 15A. The district court treated it as such, as did the state trial court and the state Superior Court. It is of some significance, therefore, that the error was not merely one involving the "admission of inadmissible hearsay or other evidence," *Bruton v. United States*, 391 U.S. at 135, 88 S.Ct. at 1627. Instead, admission of Payton's confession in the joint trial "violated [Holland's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment," *id.* at 126, 88 S.Ct. at 1622, in that it negated Holland's " 'opportunity to cross-examine the witnesses against him.' " *Id.* (quoting *Pointer v. Texas*, 380 U.S. 400, 406–07, 85 S.Ct. 1065, 1069–70, 13 L.Ed.2d 923 (1965)).

Of course, it is now established law that erroneous admission of evidence, even evidence admitted in violation of a constitutional right, is not automatically reversible error. In *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the Court held that federal constitutional errors which are harmless beyond a reasonable doubt do not require reversal, but that the beneficiary of the error, the state, bears the burden of proving harmlessness. *Id.* at 23–24, 87 S.Ct. at 827–28. In *Chapman*, the inquiry into harmlessness was articulated as "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 23, 87 S.Ct. at 827 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963)).

Whether the alleged constitutional error was harmless is a question of federal law. *Rushen v. Spain*, 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983). This frequently requires that the federal habeas court review the untainted evidence, a review that the district court undertook and that falls equally upon us since the issue is one of law.

Excluding Detective Daly's improper testimony about Holland, the evidence against Holland can be summarized as follows:

(1) Shirley Payton's testimony established that she had been friends with Holland since about 1960; that Holland had introduced her to Payton, whom she subsequently married; that English and Holland knew each other and that English's girlfriend and Holland's wife were both nurses at the same hospital and also knew each other; that in 1974, Holland was involved with a messenger service business in New Jersey and that Payton had accompanied him on several trips; that on the night of April 30, 1974, Holland and English came to the Payton apartment to pick up Richard Payton; that before they left that night, Richard took some gloves, a hat, and a sawed-off shotgun; that several of the items found in the green Buick either came from Shirley Payton's apartment or had been worn by Richard Payton when he left the apartment on the night of April 30; and that Richard Payton confessed to her on May 1 that he had robbed a house and shot at a police officer who had followed him.

(2) Officer Wade identified Holland as the front-seat passenger of the Buick, both at the time Officer Wade reviewed the four-photograph array and at trial. Officer Wade was an experienced police officer with 22½ years of service, and he testified that he stopped the car at a very well lit intersection and his attention was focused on the car's occupants because of the situation.

(3) The evidence established that Holland had knowledge of the crime area since he had worked with a package delivery service and his route included Millburn and Short Hills.

Referring to the above evidence, the district court stated, "the independent evidence of petitioner's guilt was ... overwhelming." App. at 16A. The court concluded the error was harmless, relying principally on three cases in which the Su-

preme Court applied the harmless error doctrine to *Bruton* violations.

In *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), petitioner, who was white, and his three black co-defendants were convicted of first-degree murder and attempted robbery. Each of the co-defendants confessed and the *Bruton* error consisted of the admission of references in two of the confessions to the "white guy", which the Court assumed identified Harrington. The Court held that the *Bruton* violation was harmless error because the illegal evidence was "cumulative", and the remaining evidence against Harrington "was so overwhelming" in showing guilt that the conviction need not be set aside. *Id.* at 253–54, 89 S.Ct. at 1728–29. Harrington's own testimony put him at the scene of the crime. One of the co-defendants testified and implicated Harrington as did two victims of the attempted robbery. *See id.* at 256, 89 S.Ct. at 1729 (Brennan, J., dissenting). As the majority noted, "[t]he case against Harrington was not woven from circumstantial evidence." *Id.* at 254, 89 S.Ct. at 1728.

A *Bruton* error was also found harmless in *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), where the Court stated, "[i]n some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Id.* at 430, 92 S.Ct. at 1059. In *Schneble*, the overwhelming independent evidence consisted of, *inter alia*, Schneble's own confession, "minutely detailed and completely consistent with the objective evidence," *id.* at 430, 92 S.Ct. at 1059, which included Schneble's informing police of the precise location of the body. The Court thus concluded that "the 'minds of an average jury' would not have found the State's case significantly less persuasive had the [improper] testimony ... been excluded." *Id.* at 432, 92 S.Ct. at 1060.

In the third case, *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), a *Bruton* error occurred in a trial for conspiring to transport and transporting stolen goods. Here again, there was a confession by each petitioner and there were 20 photographs taken of the crime in progress, as well as other incriminating evidence, including the testimony of five witnesses who saw petitioner unloading boxes late at night and carrying them into a store where the stolen merchandise was found. A unanimous Court concluded, "[t]he testimony erroneously admitted was merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury." *Id.* at 231, 93 S.Ct. at 1570.

The non-tainted evidence in the case before us differs in quantity and quality from that in the three cases before the Supreme Court. Shirley Payton's testimony, which places Holland in the Payton apartment with Payton and English on the evening of the robbery, is clearly damaging. Appellant attempts to lessen its importance by implying that it is unreliable because Shirley Payton had not previously mentioned this gathering at Payton's apartment on April 30 to anyone until her testimony in court. But Shirley Payton had no reason to falsely implicate Holland, and she responded to appellant's cross-examination consistently and gave reasonable responses about her motives in testifying. The record demonstrates that it was reasonable of the jury, who also could observe Shirley Payton on the stand, to find her testimony credible. Even giving it full credibility, it was at most circumstantial, and did not serve to place Holland unmistakably at the scene of the crime.

Officer Wade's identification, if fully credited, would tend to do that. Notwithstanding Wade's long and apparently distinguished service as a policeman, some reservations about his identification are inevitable. First, the identification took place almost 2½ years after the incident. Second, Officer Wade admitted he had only 20 seconds to observe the car's occupants, he was standing some five feet from the side of the car and the front seat passenger was thus several feet further from him, and for at least part of that 20 seconds the front seat passenger had leaned toward the

glove compartment. Third, Wade's original description of the front seat occupant failed to mention as a distinguishing feature Holland's prominently receding hairline, and referred to the front seat passenger as a "dark skinn[ed]" Negro whereas he was in fact, as Wade conceded in his courtroom identification, a light-skinned Negro. At trial, although Wade stated that he saw the eyes, nose and mouth of the front seat passenger, he stated he couldn't see or didn't notice whether he had a mustache. Further, for unexplained reasons, Wade had not made a composite of the front seat passenger as he had of the rear seat passenger. On the other hand, Wade attributed the error as to skin shade on the mercury lights, described the lighting conditions at 1:00 a.m. as "excellent", App. at 469A, and persisted in his unequivocal identification during cross examination.

However, Wade's very persistence elsewhere in his testimony is troubling. He testified that when he pursued the Buick through various turns on the street at 45 or 50 miles an hour, the Buick turned around a corner on Baltusrol Avenue and was out of his view for three seconds. When he next observed it, it had mounted a curb, the right passenger door was open, and it was empty. The nearest hiding place for any occupants was at least 35 feet away. Wade persisted in his implausible testimony that in a *three-second period* "the green Buick went around the corner, mounted the curb, stopped, the right hand door opened, three men got out of it and ran at least thirty-five feet," App. at 571A.

While the jury might, and apparently did, still credit Wade's identification of Holland, we believe that the short period Wade had for observation, the long time that intervened before the identification, the apparent disparity in identifying skin color, and the lack of any corroborating witnesses to the identification distinguish his eyewitness identification from the non-tainted evidence in the harmless error cases decided by the Supreme Court.

The final evidence referred to by the district court and emphasized by the state, Holland's knowledge of the crime area, was hardly inculpating in itself, although it could have supported an inference of his participation, since at least one of the robbers must have had some familiarity with the area.

Holland concedes that the non-tainted evidence in this case was sufficient for the jury to find him guilty beyond a reasonable doubt. That is not the question before us. As the Supreme Court stated in *Fahy v. Connecticut,* 375 U.S. at 86, 84 S.Ct. at 230, the question of harmless error is not simply whether there is other legally "sufficient evidence [of guilt] on which the accused could have been convicted without the evidence complained of." A harmless error inquiry into whether evidence of guilt was overwhelming cannot be collapsed into whether it was sufficient.

There is little purpose to be served for an extended dissertation on the difficulties of applying the harmless error doctrine. The issue has been the subject of extensive learned comment elsewhere. *See, e.g.,* R. Traynor, *The Riddle of Harmless Error* (1970); Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale,* 125 U.Pa.L. Rev. 15 (1976); Saltzburg, *The Harm of Harmless Error,* 59 Va.L.Rev. 988 (1973). There is some pertinence, however, to Professor Field's suggestion that the Supreme Court has variously formulated the harmless error standard, in some cases inquiring whether the constitutional error might have contributed to a guilty verdict and in others whether the non-tainted evidence was overwhelming to support the jury's verdict. *See* Field, *supra,* 125 U.Pa.L.Rev. at 32. In *Harrington v. California,* the majority vigorously disclaimed that its use of the "overwhelming evidence" test represented a departure from *Chapman,* 395 U.S. at 254, 89 S.Ct. at 1728. In any event, we believe that in this case both inquiries lead to the same conclusion.

Focusing on the non-tainted evidence first, we cannot consider the tainted evidence as merely cumulative. No eyewitness to the robbery placed Holland at the scene and Officer Wade's identification, placing Holland in what we can assume was the get-away car, is not otherwise cor-

roborated by independent evidence. Thus, this case is distinguishable from *United States v. DiGilio,* 538 F.2d 972 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977), cited by the state, where the improperly admitted *Bruton* evidence was not "significantly different" from untainted evidence, which was itself corroborated by other testimony. *Id.* at 983.

Nor do we believe that we can appropriately characterize the evidence, albeit sufficient to support a guilty verdict, as overwhelming. We believe this case is akin to *Chapman* which the Court described as "present[ing] a reasonably strong 'circumstantial web of evidence' against petitioners," but also one "in which, absent the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts." 386 U.S. at 25–26, 87 S.Ct. at 828–29. We believe the evidence produced here was not significantly stronger than that this court described as "marginal evidence" in *United States v. Reynolds,* 715 F.2d 99, 105 (3d Cir.1983), where we held the *Bruton* error was not harmless.

Turning next to the possible effect of the error, we cannot discount the possibility that the evidence complained of contributed to the jury's verdict even though we might also have found Holland guilty had we been the jurors. Payton's implication of Holland supplied the link between Holland's presence at the apartment and his identification by Officer Wade. The jury, albeit later given an instruction to disregard Daly's answer, could not disregard the evident consternation that the answer created. There was an immediate objection by counsel followed by a side bar conference, and the jury was then recessed in steps for some 24 hours. During that period, Daly's testimony that Payton had implicated Holland was the last piece of evidence before the jurors. Under the circumstances, the instruction given to the jury upon resumption of the trial to disregard Daly's answer, which was euphemistically termed "confused" by the court, imposed on the jurors an unrealistic mental gymnastic.

The review of any criminal trial to determine if there was harmless error inevitably entails a subjective judgment. Compare *United States v. Scarfo,* 685 F.2d 842, 846–47 (3d Cir.1982) (Sloviter, J.) *with id.* at 849–51 (Gibbons, J. dissenting). When the inquiry is made by a federal habeas court reviewing a state criminal trial, there are even more delicate considerations. However, we cannot shirk the responsibility placed upon us when we are convinced that conceded error cannot conclusively be regarded as harmless under any formulation of the harmless error doctrine. This is one such case.

### IV.

#### *Conclusion*

For the reasons set forth above, we will remand the case to the district court with the direction that a writ of habeas corpus shall issue unless within a reasonable time the State of New Jersey shall afford petitioner a new trial.