Gary Glenn **COOPER** and Robert Earl Calloway, Petitioners–Appellants,

v.

Gene **SCROGGY**, Superintendent, Kentucky State Penitentiary, and David L. Armstrong, Attorney General, Respondents–Appellees.

Nos. 87–5174, 87–5175.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 25, 1987.

Decided April 26, 1988.

Rodney McDaniel (argued), Asst. Public Advocate, Frankfort, Ky., for petitioners-appellants.

David Armstrong, Atty. Gen. of Kentucky, Frankfort, Ky., Joseph Johnson (argued), for respondents-appellees.

Before ENGEL, Chief Judge * and MERRITT and RYAN, Circuit Judges.

MERRITT, Circuit Judge.

This case concerns the voluntariness and admissibility of confessions. Petitioners-appellants were tried jointly in the Kentucky courts and convicted of robbery and kidnapping. Important elements of the evidence against them were confessions each gave to local authorities shortly after their arrest; the state trial judge found that each petitioner's confession was voluntarily given. Over two dissents, the Kentucky Supreme Court affirmed the convictions. Petitioners then sought issuance of the writ of habeas corpus on grounds that (1) both confessions were coerced in violation of their due process rights under the Fourteenth Amendment, and that (2) the use against Cooper of the confession of Calloway, who did not testify at trial, violated Cooper's rights under the Confrontation Clause of the Sixth Amendment. The Magistrate below held an evidentiary hearing on the petitioners' claims that included testimony from five of the six officers who participated in the interrogation of petitioners. The District Court adopted the Magistrate's recommendation that both petitions be denied. We reverse.

I.

The events in question occurred over a three day period, February 9–11, 1983. The crime began on February 9, and the coercive acts leading to the confessions began the next day.

A. The Crime

On February 9, petitioners and a third man, James Burden, who was not tried with petitioners, left Owensboro, Kentucky with a young woman named Janice Carrico. Carrico, a sophomore at Brescia College, testified that the three approached her while she was in her car in the parking lot of the college about 7 p.m., after she had finished her classes. It was undisputed that she had never seen any of the three before. According to Carrico, Calloway opened the driver's side door, brandished a knife, and "told me to scoot over or else he would stab me." The other men then got in the car.

Before leaving Owensboro, the four stopped at Carrico's bank, where she used her automatic teller card to obtain $100 in cash. At this point, Cooper took over driving. On the way out of Owensboro, the

* Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988.

Carrico car was stopped by a police officer on a routine traffic matter. Cooper got out of the car to speak to the officer; Carrico remained in the car and voiced no protest. Carrico later testified that Calloway held a knife on her during the police stop.

At the policeman's direction, Carrico then took over driving. During the night, the four stopped at a series of motels. At the first motel, Carrico testified, the men began drinking whiskey and sniffing glue. Carrico also had a drink, because "they gave it to me, and I thought I'd better drink it." Calloway and Burden then reneged on an earlier pledge "that they wouldn't hurt me, or rape me, or anything as long as I went along with them," undressed her, and unsuccessfully attempted to have sexual intercourse with her. Less than an hour later, the four left this motel and drove on to another, stayed about two hours, and then drove to a third motel in Jackson, Tennessee. There was no further sexual contact. Between the second and the third motels, Carrico's car battery went dead at a coffee shop along the highway, and the men "called a policeman or a trooper, and he came up to the car, and he went and got some jumper cables and jumped the battery." Carrico remained in the car and said nothing to the trooper.

At the third and final motel stop, Carrico and the men made several unsuccessful attempts in local banks and businesses to cash a check written on her Owensboro account. Carrico then used a pay phone to call her sister in Owensboro, and, speaking while in the men's company, "told her I had been kidnapped, and I was in Jackson, Tennessee, and that I needed some money to get home on, because they had already released me." The sister wired $100 to the Western Union in Jackson, Tennessee. The group then bought more gas and, about 11 a.m. on February 10, after taking $30 of the money sent from Kentucky but letting Carrico keep $55, the three men then had Carrico drive out onto the interstate, "and when we got on the highway, they told me to pull over, and that is when they got out, and I left."

Carrico then drove alone back to Owensboro. Upon her return, she talked with her family and reported the incident to the police. In her first statement to the police, Carrico made no mention of the attempted sexual intercourse, because:

Well, when the first—when they did it—afterwwards, they said, you know, since we didn't have intercourse you wouldn't have to worry about it, you know. And I thought, well, after I got home I'd go ahead and say something, but then after I got home, you know, mom and dad were real upset, so I just thought I'd just forget about it for now. But then they had mentioned having to take—ask me to take a polygraph test—

In her second statement, she described the sexual activity. Carrico testified that although she believed the men when they told her she would eventually be released unharmed, she "was always too scared" to try to escape. She said the men had a knife they called "Henry" and a gun they called "George." She never saw the gun but felt it as a hard object sometimes held against her from behind. No knife or gun was found in the men's possession at the time of their arrest.

### B. The Confessions

Kentucky authorities notified Tennessee authorities that the three men were wanted on warrants for kidnapping and robbery, and within a few hours Calloway, Cooper, and Burden were taken into custody by the Rutherford County sheriff's department in Murfreesboro, Tennessee. About 11 p.m. on February 10, six Kentucky officers arrived in Murfreesboro and began questioning the three suspects. At the outset of the questioning of Calloway, it is undisputed that Detective Keith Cain struck the suspect in the face. Detective Cain later testified that Calloway's "demeanor was very cocky ... and in response to a question I asked him, he infuriated me to the extent that I hit him ... in the head area. Where exactly on his head, I don't know," but the blow was "with such force that I am sure he was aware of it."

At a hearing held during trial on his motion to suppress the subsequent confes-

sion, Calloway said Cain "come from the other side of the room and kicked me right—right up here in the face with his boot." Calloway also alleged that another Kentucky officer, Frank Wall, at the same time, "hit me in the mouth with something . . . in his hand." Wall denied this allegation. Detective Cain testified that he was not alone with Calloway at the time he struck him and that the blow was struck with his hand, not his boot. Calloway later testified before the Magistrate that all six Kentucky officers were present in the room when Cain kicked him and Wall struck him, and that after the incident the others "had to drag Keith Cain out of the room." Numerous other witnesses, including police witnesses, Cooper, and two women friendly to Cooper, described Calloway as having a cut over his eye and a "busted lip" two days after this incident occurred. Police witnesses acknowledged the "busted lip" but showed a striking lack of curiosity about how Calloway had acquired it.

Detective Cain testified that "I realized as soon as I had did it, that it was not the proper procedure, and I had made a mistake in doing it." As a result, "I probably went out of my way for the rest of the evening and the morning thereafter to be extremely nice to Mr. Calloway," to cease the questioning of Calloway, and "to alienate myself as much as possible from the investigation after the incident."

Nevertheless, when the Kentucky officers left Tennessee after midnight to return the three suspects to Owensboro, Calloway was placed in the cruiser with Detective Cain and another officer, Richard Coy, for the two-and-a-half hour ride back to Owensboro. No questioning apparently took place during the ride, but Calloway later alleged that the "[o]nly thing said to me in the car was Keith Cain said, 'you know it's a long ways between here and Owensboro.'" Cain later testified that he did not "recall" making this statement and denied making "any threatening statements whatsoever." Cain said that in fact he had bought Calloway a soft drink on the way back to Kentucky as part of his effort to be nice to him. Coy confirmed the soft drink purchase.

Calloway also testified that after questioning resumed in Owensboro, Officer Jack Braden told him that "if I didn't make [a statement], what they wanted to hear, that he was going to fire my head up." By "fire my head up," Calloway said he understood Braden meant he was "going to whip me." Cooper testified before the Magistrate that he heard Braden make the "fire your head up" threat to Calloway. Braden denied "anything done in [my] presence that would indicate . . . that any threats or coercion were directed toward Mr. Calloway that would have forced him to make the statement." He was not asked specifically about the "fire your head up" accusation.

Calloway claimed that the result of Cain's and Braden's actions was that he gave them a "confession" that was not true but rather "what they wanted to hear . . . —like we tell you what to say and you give us the answers." Calloway's statement, given in narrative question-and-answer form and tape recorded, in its transcribed form was about seven pages long.

Cooper rode back from Tennessee in a second car with officers Nickens and Wiedemann; Burden was in a third car with Braden and Wall. Cooper testified that he was not questioned about Carrico until the group's return to Kentucky, but that he was questioned intensively during the ride back about another kidnap-murder case also under investigation. Cooper claimed further that after arriving in Owensboro, Detective Cain, the same officer who had struck Calloway (though Cooper did not know the identity of Calloway's assailant at the time), also used physical force on him:

> [F]inally—I was still handcuffed and Detective Cain, he come up—he come up behind me, and grabbed me by the hair of the head like that, and leaned me back and hit me in my chin and then across my—the side of my face, and then he said something else about, 'well, I want you to hit me back,' or something like that. And I told him I wasn't stupid, and he said something about taking off the handcuffs, and after that they just kept

on interrogating us about that, and after they got through with that, I kept on asking ... if I could have my lawyer present.... I asked repeatedly for my attorney to be there, but I never did get him.

Detective Cain denied "any exchanges whatsoever" with Cooper, and specifically denied striking him or pulling his hair.

Cooper also said that he saw Calloway bearing the bruises of his interrogation, although it is unclear whether he saw him before or after Cooper made his own confession. At a mid-trial suppression hearing, Cooper testified:

Q. (by Cooper's attorney) Where were you when you saw [Calloway]?

A. It was in the Detective Bureau station [in Owensboro] upstairs. They was finger—getting ready to finger-print us and bring us back. He had a cut on his eye and a busted lip.

Q. *Was that prior to your statement?*

A. *After.*

Q. *It was after?*

A. Because they was getting ready to bring us back. They was fingerprinting us.

Q. Did you notice he'd been struck on the side of the face *prior to making your statement?*

A. *All I knew that he'd been struck.*

Q. How did you know that?

A. Because I see him when he came out.

Q. Okay. Was that *before you made this statement, or after?*

A. *It was after the statement was made when I seen him.*

Trial Transcript at 123 (emphasis added).

Before the jury, Cooper, apparently describing the period of time before leaving the Tennessee interrogation site, testified:

And then after that, you know, they—they already had been asking Bobby [Calloway] questions, and when Bobby come out, his mouth was busted, and he did—and he had a cut over his eye, and he was limping, and I asked him what happened. He said he got hit. He didn't say which officer hit him, so I assume—

Mr. Cain said that he's the one that done it, and don't doubt his word. He probably did. But anyway *after that, they took us to the Owensboro Police Department....*

Tr. Trans. at 173 (emphasis added).

And at the evidentiary hearing before the Magistrate, Cooper was asked:

Q. Now at the time you made your statement *you were aware that Officer Cain had already injured Mr. Calloway,* is that right?

A. *Yes sir,* he was already out there in the front detective office....

Trans. Evidentiary Hearing at 36 (emphasis added).

Cooper claimed further that several times during the course of his interrogation he asked to no avail that his lawyer be present. However, the testimony of all the Kentucky officers was uniform and convincing that Cooper received Miranda warnings on multiple occasions, and the transcript of Cooper's statement begins with a recitation that "you have the right to have an attorney present now or at any later time." Thus, Cooper's claim of a Sixth Amendment right-to-counsel violation depends on the voluntariness of this waiver of counsel, which in turn is indistinguishable from the voluntariness of the confession that immediately followed.

Burden gave his tape-recorded statement to the Kentucky authorities at 4:30 a.m. on February 11. Calloway's statement was given at 5:00 a.m. to Detectives Wall and Braden; Cooper's was given at 5:58 a.m. to Detectives Wall and Nickens.

## C. The Trial

At trial, the prosecutor's case consisted entirely of the testimony of Carrico and her sister, and of two detectives, Braden and Nickens, through whom the confessions of Calloway and Cooper were read into evidence. The detectives testified that the statements were made voluntarily. The defendants called Detective Cain to elicit testimony about the circumstances of Calloway's confession. Cooper was the only other defense witness; Calloway did not testify.

Just before the prosecutor moved to admit the first of the two confessions, the trial judge held an in-chambers hearing out of the presence of the jury to rule on the admissibility of the confessions. The judge heard testimony from officers Braden, Nickens, Cain and Weidemann, defendants Calloway and Cooper, and the two women who saw Calloway at his arraignment some 48 hours after the interrogation. The judge concluded that the confessions were voluntarily given, but he conditioned their admission in evidence upon an ultimate jury finding that they were given voluntarily. The jury was so instructed.

Because Calloway did not testify, the jury heard only Detective Cain's version of the blow or blows Calloway received in Tennessee. The jury did not hear at all about Cain's alleged remarks about the "long way" from Murfreesboro to Owensboro or about Detective Braden's alleged threat to "fire up" Calloway's head. The jury did hear Cooper's story, including his allegation that Cain had grabbed his hair and hit him. Contrary to what he had said to the police in his confession, Cooper claimed that Carrico had originally approached the three seeking to obtain some marijuana, and was at no time during the entire incident threatened by a gun, or a knife, or any other threat of force.

The jury returned guilty verdicts on both the robbery and kidnapping counts for each defendant, fixing punishment at 20 years imprisonment on each count. The jury then raised Calloway's sentence to life imprisonment on each count under Kentucky's persistent felony offender statute, which gave the jury a heightened sentencing range of 20 years to life. Calloway had been convicted in the same county in 1975 of kidnapping.

## II.

Because our criminal justice system is accusatorial, not inquisitorial, the State must establish guilt by evidence "independently and freely secured." Convictions based upon involuntary confessions extracted by police overreaching, i.e., the result of either physical or psychological coercion by the State, offend the Due Process Clause and must be set aside. *Rogers v. Richmond*, 365 U.S. 534, 540–41, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961); *see Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 520–21, 93 L.Ed.2d 473 (1986); *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985).

■ Determining whether a confession is "voluntary" for due process purposes entails an examination into the "totality of the circumstances" to determine whether the confession was procured by acceptable techniques that draw upon an essentially free and unconstrained choice or by unacceptable tactics that extract their results from an overborne will. The critical line of distinction is between "self-direction" and "compulsion." *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). Because this inquiry turns not only on whether the defendant's will was in fact overborne, but also on whether the overall conduct of the officials was incompatible with our system of accusatorial justice, a federal court reviewing a habeas petition undertakes an independent review of the ultimate question of "voluntariness." *See Miller*, 106 S.Ct. at 453.

This determination is rarely easy for a reviewing court. Interrogation usually takes place behind closed doors away from the observation of disinterested witnesses. Coercion may take many forms. The fine line between permissible police conduct and techniques offensive to due process may be difficult to discern. Due to increasing police sophistication in the modern era, in the usual case it is psychological rather than physical coercion that is the claimed abuse. *See Jackson v. Denno*, 378 U.S. 368, 389–90, 84 S.Ct. 1774, 1787–88, 12 L.Ed.2d 908 (1964); *Spano v. New York*, 360 U.S. 315, 321, 79 S.Ct. 1202, 1206, 3 L.Ed.2d 1265 (1959). This case, however, is something of a throwback to an earlier era.

■ The use of physical force by interrogators creates a heavy presumption, if not a *per se* rule, that there has been a violation of due process. *See Stein v. New*

*York,* 346 U.S. 156, 182–83, 73 S.Ct. 1077, 1091–92, 97 L.Ed. 1522 (1953); *United States v. Brown,* 557 F.2d 541, 554 (6th Cir.1977) (although a single blow may be insufficient without more, infliction of physical violence is nonetheless a "weighty factor"). As Justice Jackson explained in *Stein,* physical violence or the threat of it "serves no useful purpose." When either is present,

> [t]here is no need to weigh or measure its effects on the will of the individual victim. The tendency of the innocent as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain is so strong that judges long ago found it necessary to guard against miscarriages of justice by treating any confession made concurrently with torture or threat of brutality as too untrustworthy to be received as evidence of guilt.

346 U.S. at 182, 73 S.Ct. at 1091–92.

In Calloway's case, there are three alleged instances of force or threat of force. First, it is undisputed that Detective Cain struck Calloway, and it is evident that this brutality led to an injury of significance. Next, Calloway's claim that Detective Wall hit him was contradicted by Wall. Finally, Calloway's claim of the threat by Detective Braden was corroborated by Cooper and *not* denied flatly by Braden himself.

Braden's testimony at trial—he was the only one of the six officers who did not testify before the Magistrate—did not deny the "fire your head up" threat either specifically or by implication. Instead, Braden denied "anything done in [my] presence that would indicate ... that any threats or coercion were directed toward Mr. Calloway *that would have forced him to make the statement.*" Tr. Trans. at 140 (emphasis added). Thus, his denial seemingly would encompass only threats that in his own view were of coercive consequence. This type of "denial" is too qualified to be given persuasive weight when, as here, admitted physical force already has been used on an interrogatee. Similarly, we do not think that Detective Cain cured what occurred at the beginning of Calloway's questioning by buying him a soft drink or by otherwise being "extremely nice" to his prisoner. Instead, Cain compounded the problem by continuing to serve as one of Calloway's captors in the car on the lengthy ride back to Kentucky and by remaining at the Owensboro police station during the subsequent interrogation of the suspects. Given what had already transpired, Cain's continued presence in the patrol car could only have been intimidating to Calloway. The more effective way to cure the coercive atmosphere created by Cain would have been to separate Cain from Calloway, by sending Cain back to Kentucky in a patrol car separate from Calloway, and then by sending him home. *Cf. Ward v. Texas,* 316 U.S. 547, 62 S.Ct. 1139, 86 L.Ed. 1663 (1942) (constable first slapped interrogatee, then rejoined his interrogation); *Jackson v. State,* 209 Md. 390, 121 A.2d 242 (1956) (officer beat prisoner, then was present when he confessed two days later in a "calm atmosphere"; confession suppressed).

█ In sum, we conclude that the blow delivered by Cain created a coercive environment. The police failed to change that environment on the night of the incident, and the state failed to satisfy its evidentiary burden to rebut the evidence that there was more than one blow (supported by the two arraignment witnesses) and that Braden made a threat (supported by Cooper's testimony). The clear evidence of brutality and injury plus these additional factors lead to the conclusion that Calloway's confession was involuntary within the meaning of the Due Process Clause and should have been suppressed.

█ Cooper's confession presents a closer question. His claim that Detective Cain struck him and threatened him was not corroborated by any other evidence, but at the same time was not squarely contradicted. Although, as noted above, there is some ambiguity whether Cooper saw Calloway's bruised face before giving his own statement, on balance his testimony supports this finding. And Cooper also testified that he witnessed Braden's "fire your head up" threat to Calloway. Giving heavy

weight to the uncontested fact that Cooper's co-arrestee Calloway *was* physically abused, *United States v. Brown*, 557 F.2d at 554, we conclude that Detective Cain's physical abuse of Calloway created a coercive environment in which Cooper reasonably feared that he too was threatened with physical abuse. The police took no steps to change the environment and probably added to it by later threats.

In concluding that both codefendants' confessions were involuntary, we overturn no findings of fact by the state courts, only its general conclusions. Neither the state trial judge nor the Kentucky Supreme Court made any express findings of fact[1] that support their ultimate and wholly conclusory determinations that the defendants' confessions were voluntary. Had underlying findings of fact been made, we would of course be required to view them with the presumption of correctness mandated by 28 U.S.C. § 2254(d), subject to any applicable statutory exceptions. *See Miller v. Fenton*, 106 S.Ct. at 451 (presumption to be accorded to "subsidiary factual questions" such as whether a drug acts like a truth serum, or whether police engaged in the intimidation tactics alleged by the defendant).

Deterrence of police overreaching, as Justice Jackson made clear, is a major purpose underlying the principle of due process that excludes involuntary confessions. Due process does not permit the police to extract confessions and procure indictments through brutality and threats of violence. It is clear that the police created a coercive environment through brutality in this case, extracted the confessions while the environment continued, did not give assurances of fair treatment, provide a lawyer, let time go by or do any other acts to change the environment. Therefore, the confessions must fall.

## III.

█ Even if Cooper's confession were held voluntary, he should receive a new trial because the admission of Calloway's confession, which incriminated Cooper, violated Cooper's Confrontation Clause rights.

At different points in the trial, each defendant's confession was introduced over objection. Cooper testified during trial; Calloway's testimony was confined to the suppression hearing held out of the hearing of the jury. The only limiting instructions given to the jury about the confessions concerned the issue of voluntariness. The jury was *not* told that Calloway's confession could be regarded as evidence only against Calloway, but not against Cooper. Indeed, the prosecutor in a strong closing argument expressly compared the "hand-in-glove" similarity of Calloway's confession with Cooper's confession in arguing for Cooper's guilt. Tr. Trans. at 228–30. Thus Calloway's confession was admitted and used to convict Cooper. Not only was it coerced, it was hearsay evidence pure and simple which is not admissible under the Confrontation Clause.

Subject to two exceptions, the Confrontation Clause forbids the admission of out-of-court statements by a nontestifying codefendant as substantive evidence[2] against a

---

1. The Kentucky Supreme Court, noting the trial court's apparent reliance on the credibility of the police officers, regarded the trial court's determination of voluntariness as a finding of fact reviewable under a "clearly erroneous" standard. *Calloway v. Commonwealth,* No. 83–SC–732–MR, slip op. at 4 (Ky. June 14, 1984). Despite this characterization by the state appellate court, an examination of the trial record confirms that the trial judge made no subsidiary findings—such as whether Cooper was in fact struck by Cain, but rather made one overall determination of voluntariness. But this is precisely the determination reserved for our independent review by the long line of cases that culminated in the explicit reaffirmation of *de*

*novo* review provided by the Supreme Court in *Miller v. Fenton.*

2. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), imposes a further restriction that a defendant is deprived of Confrontation Clause rights when a codefendant's incriminating confession is introduced at a joint trial, even if the jury is instructed to consider that confession only against the codefendant. *Bruton* is an exception to the usual presumption that juries will follow their instructions—an exception justified by the great prejudicial power and evidentiary weight of confessions. The *Bruton* rule is subject to the same two exceptions—"indicia of reliability" and "harmless error"—as is the *Lee–Douglas* rule. *See Cruz v.*

defendant. *See Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

The first exception is if the codefendant's confession "bears sufficient indicia of reliability" or is otherwise accompanied by "particularized guarantees of trustworthiness" to overcome the presumption of unreliability that normally attaches to hearsay evidence for purposes of analysis under the Confrontation Clause. *Lee,* 106 S.Ct. at 2063–64. *See Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), and this Court's extended discussion of the standard in *Steele v. Taylor,* 684 F.2d 1193, 1200–04 (6th Cir.1982), *cert. denied,* 460 U.S. 1053, 103 S.Ct. 1501, 75 L.Ed.2d 932 (1983). The second exception is the "harmless error" standard of *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The Commonwealth argues here that because Cooper's own confession "interlocks" with Calloway's, both exceptions apply. We disagree.

In *Cruz v. New York* and *Lee v. Illinois,* the Supreme Court said that a defendant's own "interlocking" confession may be used to establish the reliability of a nontestifying codefendant's confession, if there are no significant discrepancies between the two versions and one statement "thoroughly substantiate[s]" the other. *Lee,* 106

S.Ct. at 2064–65; *Cruz,* 107 S.Ct. at 1719. We agree with the Commonwealth that Cooper's confession differs from Calloway's in only insignificant detail. The fact of "interlocking," however, does not conclude the inquiry into reliability and does not overcome the fact that it was procured by coercion.

As discussed in Part II, *supra,* the standards by which voluntariness of a confession is assessed include more than mere unreliability of a coerced confession. Indeed, our holding that Calloway's confession was involuntary was premised as much upon a conclusion that the *techniques used* were offensive to due process as upon a firm conviction that his will had in fact been overborne. *See Miller v. Fenton,* 106 S.Ct. at 453; *Blackburn v. Alabama,* 361 U.S. 199, 207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960) (voluntariness incorporates a "complex of values").

Nonetheless, the application of physical force, the coercive atmosphere, and the continued threat of more blows certainly cast enough doubt upon the reliability of Calloway's confession that it fails to pass muster under the "indicia of reliability" standard. It would be strange indeed if Calloway's confession were inadmissible against him because it is involuntary but admissible against Cooper because it is "reliable."

Nor was any error harmless beyond a reasonable doubt.[3] This was a case in

---

*New York,* —— U.S. ——, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987).

Although the parties have argued the issue of the admissibility of Calloway's confession in terms of the *Bruton* rule, this line of cases is inapplicable to Cooper and Calloway, because the trial judge here gave no limiting instruction to confine the use of Calloway's confession to Calloway, see *Lee,* 106 S.Ct. at 2063, and the confession was admitted and used against Cooper.

**3.** The Commonwealth makes the remarkable argument that this Court is bound by the holding of the Kentucky Supreme Court in this case, citing *Butler v. Commonwealth,* 516 S.W.2d 326 (Ky.1974), that the evidence provided by Calloway's confession was only "cumulative" and therefore harmless. The Commonwealth's brief states:

It is a fundamental principle that state interpretation as to the scope and application of *state law* is binding on the federal courts. The Kentucky Supreme Court's application of *Butler* to the case at bar is binding on this Court.

Appellee's brief at 16 (citations omitted) (emphasis added).

Obviously, we defer to state courts' interpretations of state law. But the Constitution supersedes contrary state law. If the Commonwealth's argument is that a state standard of harmless error may conflict with and override the federal constitutional standard, the Commonwealth's "fundamental principle" is at odds with the fundamental principle of the Supremacy Clause that we would think self-evident to most lawyers, and which was applied to the "harmless error" issue more than 20 years ago in *Chapman v. California,* 386 U.S. 18, 20–21, 87 S.Ct. 824, 826, 17 L.Ed.2d 705 (1967).

which, in order to decide the central issue—whether Carrico was taken away against her will—the jury was required to weigh Carrico's testimony and Cooper's confession at the police station against Cooper's in-court testimony. There was no other inculpatory evidence. In these circumstances, the addition of Calloway's statement in all probability carried great weight with the jury, not only in their presumed determination that Cooper's confession was voluntary but also in their choice to reject the version of events that Cooper related in his trial testimony.

## IV.

For the reasons stated above, the order of the District Court is reversed and the case remanded with directions that the District Court issue the writ of habeas corpus unless the Commonwealth affords petitioners a new trial within a period of time to be established.

RYAN, Circuit Judge (concurring in part, dissenting in part).

While I agree that the receipt in evidence of defendant Calloway's confession violated his constitutional rights under both the fifth and fourteenth amendments, I do not agree that the receipt of defendant Cooper's confession violated his constitutional rights under either provision. After a careful review of the record under the standards announced in *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), I am not persuaded that Cooper's confession was the product of any physical or psychological coercion or any combination thereof, and it has not been shown to my satisfaction to have been involuntary

either as compelled self-incrimination or a statement taken in a fashion offensive to the guarantees of the due process provision of the fourteenth amendment. Cooper testified both that Calloway's statement was made before Cooper's confession and that it was made afterwards. Cooper's statement that he witnessed Braden's "fire your head up" threat to Calloway is entirely uncorroborated, and the mere fact that "Cooper's co-arrestee Calloway was physically abused" does not, to me, justify the quantum leap to the conclusion that the abuse of Calloway "created a coercive environment in which Cooper reasonably feared that he too was threatened with physical abuse."

Although I think the majority's conclusion that Cooper's confession was coerced is entirely unjustified, I agree that his constitutional rights under the sixth amendment were violated when Calloway's confession, which incriminated Cooper, was introduced against Cooper and over his objection. Indeed, I concur in part III of the majority opinion.

For the foregoing reasons, I concur in parts I and III of my brothers' opinion, and in so much of part II as holds that the introduction of Calloway's confession in evidence violated his constitutional rights under the fifth and fourteenth amendments. Thus, I concur in the judgment.

*Butler* was an application by the Kentucky Supreme Court of the *federal* harmless error standard as enunciated in *Chapman v. California* and *Harrington v. California.* See *Butler,* 516 S.W.2d at 328 (citing *Harrington* ). If the Commonwealth's argument instead is that we should accord the § 2254(d) presumption of correctness to a state court's ultimate determination under *Chapman* that a constitutional error has been harmless, the answer is that this ultimate determination is an issue of federal law to be reviewed *de novo.* See *Rushen v. Spain,* 464 U.S. 114, 121, 104 S.Ct. 453, 457, 78

L.Ed.2d 267 (1983); *Holland v. Attorney General of New Jersey,* 777 F.2d 150, 156 (3d Cir.1985). Underlying determinations of fact may be subject to the § 2254(d) presumption, see *Miller v. Fenton,* 106 S.Ct. at 451, but the state court made no such findings. The only premise for the Kentucky Supreme Court's harmless error holding was that the victim's testimony coupled with Cooper's confession (which we have held inadmissible) provided "overwhelming" evidence of Calloway's guilt. *Calloway v. Commonwealth,* No. 83–SC–732–MR, slip op. at 7.