UNITED STATES of America,
Plaintiff–Appellee,

v.

Jeffrey JENKINS, Defendant–Appellant.

No. 89–50248.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 10, 1990.

Withdrawn from Submission
Nov. 5, 1990.

Resubmitted March 20, 1991.

Withdrawn from Submission
April 26, 1991.

Resubmitted May 20, 1991.

Decided July 5, 1991.

935

Carlton F. Gunn, Deputy Federal Public Defender, Los Angeles, Cal., for defendant-appellant.

Mark C. Holscher, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before FLETCHER, BOOCHEVER and WIGGINS, Circuit Judges.

BOOCHEVER, Circuit Judge:

Jeffrey Jenkins was found guilty of possessing an unregistered sawed-off shotgun in violation of 26 U.S.C. § 5861(d). He appeals, arguing that the district court erred in finding his post-arrest confessions voluntary, admitting certain evidence, and failing to give a particular jury instruction. Because we conclude that the district court erroneously admitted Jenkins's coerced confessions, we reverse without reaching the other issues raised on appeal.

## I. FACTUAL BACKGROUND

A Seattle narcotics task force was investigating Los Angeles gang members who sold narcotics in Seattle. Jenkins's brother, Derrick Hargress, was indicted in Seattle on narcotics and firearms charges. Seattle task force members obtained a warrant to search Jenkins and Hargress's residence in Inglewood for trafficking ledgers, firearms, narcotics, and cash.

On May 11, 1988, at 8:30 p.m., federal agents and local police officers went to Jenkins's home to execute the warrant. The government contends that, upon approaching Jenkins who was outside the front of the house, the police identified themselves, specifically yelling, "Stop, police!" and "Freeze!" Nonetheless, Jenkins ran through a back door into the house from which he fired at the police several rounds of semi-automatic rifle fire.

Jenkins, on the other hand, testified that he never heard the police identification. Instead, Jenkins, who had been shot three times in the stomach only months earlier, believed the darkly clad men were Mexican gang members out to kill him. This testimony was corroborated at trial by two witnesses in the house at the time. Jenkins's mother testified that her son came running in the house yelling, "Momma, Momma, they coming to get us. They come to kill us. Call 911." She further testified that he said it looked like Mexicans. John Brewer, a family friend present at the time of the shootout, similarly testified that Jenkins said, "[n]ow they're sending three Mexicans after me."

There was also testimony at trial that, when Mrs. Jenkins called 911 to report the shooting, she was told "[w]e know Ma'am, we know. Just hang up. Please just hang up the phone." Ms. Jenkins testified that the police dispatcher did not say that the police were there, or that they were being shot at. Consequently, she told Jenkins the police "should be on their way." Thereafter, the police called the house. Ms. Jenkins was told by the officer to "[t]ell [Jenkins] to come out the front door with his hands up." She testified that, when told, her son immediately placed his rifle on the bed and complied, while she remained on the line as ordered. Ms. Jenkins, her granddaughter, and Brewer also exited the house as instructed. Jenkins, Ms. Jenkins, and Brewer were arrested and taken to the police station. Jenkins was beaten and threatened with death by the police during and after his arrest. *See infra*, Section II.

In the meantime, the officers searched the house pursuant to the warrant. On the bed in Jenkins's bedroom they found the AR–15 rifle which Jenkins had fired at police. A sawed-off shotgun and a .38 caliber revolver were found under the mattress. Police also found three other firearms. All six were loaded.

At the police station, Jenkins complained of abdominal pain related to his prior gunshot wounds, allegedly exacerbated by the police beating. He was taken to the hospital and subsequently returned to the police station at about 2:00 a.m. where an Inglewood police officer, Detective Lawrence Marino, questioned him. After receiving his *Miranda* warnings and waiving his rights, Jenkins admitted, among other things, owning the sawed-off shotgun.

Five hours later, allegedly having had no sleep, Jenkins was interviewed again, this time by a detective of the Seattle Police Department. Jenkins again waived his rights and again admitted owning the sawed-off shotgun. At the end of the interview, the detective asked Jenkins if he would like to make a formal statement, and Jenkins replied that he would rather not.

An indictment charged Jenkins with four counts of attempted murder of a federal agent, four counts of assault on a federal agent, use of a firearm during a crime of violence, and possession of an unregistered sawed-off shotgun. Before trial, Jenkins filed both a motion to suppress his statements and a motion to suppress evidence that he possessed the firearms, contending that his admissions were coerced. The district court denied the motions.

The jury acquitted Jenkins of all but the sawed-off shotgun possession charge, presumably accepting the reasonableness of his belief, under the circumstances, that he was firing in self-defense at Mexican gang members. This appeal followed.

## II. PROCEDURAL HISTORY

In appellant's brief and at oral argument, Jenkins's counsel argued that the district court erred in concluding that Jenkins's post-arrest statements were voluntary because there was unrefuted testimony that Jenkins had been beaten and threatened by the police. Because the district court found the statements voluntary without making specific findings with respect to Jenkins's claims, we withdrew submission of the case and remanded to the district court for specific findings.

The district court found that upon exiting the house as ordered, Jenkins was thrown to the ground and repeatedly kicked in the groin, stomach, and back by

the arresting officers. It further found that an arresting officer who knew Jenkins had been recently shot said "something similar to, 'They should have killed you, but that's okay, we'll do it.'" The court also found that, while on their way to the police station after Jenkins's arrest, the officers stopped in the Los Angeles Forum parking lot. There they showed Jenkins a gun which they talked about planting on him, then shooting him, claiming he tried to escape. Indeed, the court found that one of the officers indicated that they could not follow through on their plan because there were some cars in the parking lot. Despite these findings, the court found the confessions voluntary.

Only days after we received the district court's supplemental findings, the Supreme Court announced its decision in *Arizona v. Fulminante*, — U.S. —, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), in which, among other things, it subjected a coerced confession to harmless-error analysis. Once again we withdrew submission, this time to afford the parties an opportunity to address the impact of *Fulminante* on this case. Pursuant to our order for supplemental briefing, the government has candidly conceded that, should we find the confessions coerced, it would be unable to meet its burden of proving harmless error beyond a reasonable doubt.

### III. DISCUSSION

On pretrial motions to suppress, and now on appeal, Jenkins claims the beatings, death threats, his fatigue, and various police inducements overbore his will, rendering involuntary his two confessions that he owned the sawed-off shotgun. Jenkins contends that, by admitting the confessions as voluntarily made, the court committed reversible error violative of due process. Because we find that the beatings and death threats alone were sufficient to make the initial confession coerced, and because we find that no amelioration of the coercive environment cured the second confession, we express no opinion about Jenkins's fatigue and the alleged inducements. Moreover, while there is some question whether

the Supreme Court meant to apply harmless-error analysis to confessions induced by physical violence or torture, our need to pass on that question is obviated by the government's concession that, if the statements were coerced, their admission could not be proved harmless beyond a reasonable doubt.

### A. VOLUNTARINESS

While it is the government's burden to prove by a preponderance of the evidence that the two confessions were voluntary, *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972), here, it relied solely on the erroneous assumption that the district court did not believe Jenkins's allegations of beatings and death threats. Indeed, the government all but conceded that, if the district court found Jenkins's factual allegations true, it would have to find the confession involuntary. *See* Appellee's Brief at 16 ("[T]here is no way the district court could have denied defendant's motion to suppress if it believed his story of death threats, beatings and withholding of counsel."); *id.* at 17 ("[I]t is abundantly clear that the court did not believe defendant's claim that he was beaten, much less that he was threatened with murder."); *id.* at 18 ("Far from ignoring defendant's testimony, it is obvious that the court simply dismissed it as incredible."). Thus, the government never explained why, assuming the beatings and death threats took place as the court actually found, the confession should be considered voluntary. It therefore failed to satisfy its burden of proof. Nonetheless, we feel compelled to proceed, particularly in light of the district court's conclusion that, notwithstanding the beatings and threats, "under the totality of circumstances, [Jenkins's] statements were voluntary."

We accept the factual findings underlying a district court's determination regarding the voluntariness of a confession unless clearly erroneous. *United States v. Wolf*, 813 F.2d 970, 974 (9th Cir.1987). However, we review *de novo* a district court's ultimate conclusion that a confes-

sion was voluntary. *Id.* Here, the district court found that Jenkins was beaten and threatened. Seeing no clear error in these findings, we accept them and turn our attention to the legal question.

■ Ordinarily, to determine the voluntariness of a confession, we consider the "totality of circumstances" surrounding it. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Thus, the question to be faced in each case is whether the defendant's will was overborne when he confessed, *Fulminante,* 111 S.Ct. at 1252 n. 2, *i.e.,* "[i]s the confession the product of an essentially free and unconstrained choice by its maker?" *Id.* at 1261 (Rehnquist, C.J., dissenting in part). Nevertheless, in some cases, the need for such an individual calculus is obviated by the egregiousness of the custodian's conduct. Indeed, confessions accompanied by physical violence wrought by the police have been considered *per se* inadmissible. *Stein v. New York,* 346 U.S. 156, 182, 73 S.Ct. 1077, 1091, 97 L.Ed. 1522 (1953), *overruled on other grounds by Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)[1]; *Miller v. Fenton,* 796 F.2d 598, 604 (3d Cir.1986) (noting that *"per se* involuntariness rule applies when an interrogation is accompanied by physical violence"), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). *See also Cooper v. Scroggy,* 845 F.2d 1385, 1390 (6th Cir.1988) ("The use of physical force by interrogators creates a heavy presumption, if not a *per se* rule, that there has been a violation of due process.") (citations omitted).

■ Such confessions properly are presumed involuntary because of, among other things, both their unreliability and the great likelihood that the use or threatened use of violence overbears a suspect's will. As *Stein* noted:

Physical violence or threat of it by the custodian of a prisoner during detention serves no lawful purpose, invalidates confessions that otherwise would be convincing, and is universally condemned by the law. When present, there is no need to weigh or measure its effects on the will of the individual victim. The tendency of the innocent, as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain is so strong that judges long ago found it necessary to guard against miscarriages of justice by treating any confession made concurrently with torture or threat of brutality as too untrustworthy *to be received as evidence of guilt.*

*Stein,* 346 U.S. at 182, 73 S.Ct. at 1091 (emphasis added). More recently, the Court has reinvigorated this *per se* approach by recognizing the importance of process-based rationale, independent of possible unreliability, for judging the voluntariness of confessions. Thus, in *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), the Court called attention to its "consistently held view that the admissibility of a confession turns as much on whether the techniques for extracting the statements ... are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." *Id.* at 116, 106 S.Ct. at 452 (citations omitted).

Although *Stein* was overruled on other grounds by *Jackson v. Denno,* 378 U.S. 368, 391, 84 S.Ct. 1774, 1788, 12 L.Ed.2d 908 (1964),[2] its conclusive presumption of coercion in beating cases seems as appropriate now as when it was first articulated. In no way did *Denno* repudiate *Stein's* special rule for confessions induced by brutality. If anything, *Denno* merely invoked

---

**1.** For discussion of relationship between *Stein* and *Denno, see supra* note 2 and accompanying text.

**2.** *Stein,* which primarily held that tentatively submitting the issue of a confession's voluntariness to a jury with instructions to reject the confession and proceed on the basis of the other evidence should it find the confession involun-

tary did not violate due process, was overruled by *Denno* largely because *Stein's* procedure of submitting voluntariness to the jury posed too great a risk that the jury would be unable to set aside completely a confession it found to be involuntary but believed truthful. *Denno,* 378 U.S. at 389, 84 S.Ct. at 1787.

additional justifications, independent of the possible unreliability of such confessions, for forbidding their use. Thus, *Denno* explained that:

> [i]t is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will," *Blackburn v. Alabama*, 361 U.S. 199, 206–207 [80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960)], and because of "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York*, 360 U.S. 315, 320–321 [79 S.Ct. 1202, 1205–1206, 3 L.Ed.2d 1265 (1959)].

*Denno*, 378 U.S. at 385–86, 84 S.Ct. at 1785. We, therefore, agree with those courts of appeals that implicitly have decided that *Stein*'s *per se* approach survived *Denno*. *See Scroggy*, 845 F.2d at 1390; *Fenton*, 796 F.2d at 604.

Although we have found no cases addressing this point, it appears most likely that *Stein*'s *per se* approach is limited to those confessions made substantially concurrently with physical violence. This does not, of course, mean that only those confessions literally made during beatings are *per se* involuntary. Such a rule would be grossly underinclusive as " '[e]ven the most brutal physical torture ... usually produces a confession, not during the actual torture but afterwards through fear of repetition.' " *Jackson v. State*, 209 Md. 390, 121 A.2d 242, 244 (Md.1956) (citation omitted). It would most certainly undermine one of the bedrock premises of our prohibition against coerced confessions: " 'that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.' " *Fulminante*, 111 S.Ct. at 1256 (quoting *Rogers v. Richmond*, 365 U.S. 534, 540–41, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961)). But, a rule that all confessions preceded by violence are incurable, irrespective of ameliorative circumstances, may be too rigid.

■ The difficulty is drawing the line between those confessions properly considered to have been made concurrently with violence, in which a conclusive presumption that one's will is overborne is appropriate, and those sufficiently attenuated from such misconduct to justify application of the more lenient "totality of circumstances" test. Here, because the court found the confessions voluntary without articulating any reasons, we assume it relied on the time which elapsed between the police misconduct and the confessions. Indeed, because it specifically applied the "totality of circumstances" test, the court must have decided the time period sufficiently attenuated the misconduct to justify departure from the *per se* rule applicable to concurrent beatings. Under our *de novo* review, we must independently decide the effect of the time interval, and assuming the applicability of "totality of the circumstances" test, whether the confessions were voluntary.

### 1. The First Confession

■ While neither party pinpoints the timing of Jenkins's beating and the death threat, we reasonably may assume they occurred at approximately 9:00—9:30 p.m. Immediately thereafter, Jenkins was taken to the Inglewood police station, and then to the hospital. Upon his return from the hospital at 2:00 a.m., he confessed to owning the unregistered shotgun.

After being both beaten, and perhaps more seriously, told of a devious plan to kill him, it is not at all surprising to us that Jenkins might have capitulated. He knew that the police brazenly had beaten him a few hours earlier. An officer had told him the police would kill him. Finally, he was

taken to a parking lot where the officers unravelled to Jenkins their insidious plan. Based on these circumstances, the danger was impermissibly great that Jenkins told the police precisely what he believed they wanted to hear. *See Stein,* 346 U.S. at 182, 73 S.Ct. at 1091–1092 (noting "tendency of the innocent, as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain ..."); *LaVallee v. Delle Rose,* 410 U.S. 690, 700, 93 S.Ct. 1203, 1208, 35 L.Ed.2d 637 (1973) (referring to psychiatric testimony that defendant was probably so exhausted from his long ordeal at the hands of the police that " 'he would say yes if you asked him if the moon were made of green cheese.' "); *People v. Berve,* 51 Cal.2d 286, 290, 332 P.2d 97 (1958) (defendant had testified that, after hours of beating and death threats, he "would have agreed with anything in the world just to be let alone"). This conclusion seems even more plausible when, as far as Jenkins knew, the only reason the police did not kill him in the Forum parking lot was because of their worry they might be discovered.

The circumstances of this confession present a classic case of coercion. Defendant is beaten and threatened with death, shuttled between the hospital and jail, questioned immediately upon his return in the small hours of the morning, at which point he confesses. While it is true that Jenkins did not blurt out a confession while being beaten or threatened, there is no evidence he was even questioned at that earlier time. Instead, a brief period of time, consumed almost exclusively by his hospital treatment, passed without any curative measures aimed at dissipating the coercive environment. At the first occasion for him to capitulate, at his initial questioning, he did.

Given the circumstances of this case, we believe that the implicit threat of a repetition of the beatings and the fear that the police might make good on their twice-promised death threat were sufficient to render Jenkins's 2:00 a.m. confession coerced. *See Scroggy,* 845 F.2d at 1391–92 (striking suspect and threatening him with physical abuse caused both his confession and that of his co-defendant to be stricken as involuntary). Thus, we find that the first confession was involuntary. *See Autry v. McKaskle,* 465 U.S. 1085, 1090, 104 S.Ct. 1458, 1462, 79 L.Ed.2d 906 (1984) (Marshall, J., dissenting from denial of certiorari) (finding it "implausible that six hours of sleep could erase from petitioner's consciousness the fear that the earlier beating must have engendered").

We do not decide whether a confession preceded by police brutality and death threats is always involuntary, nor do we resolve the particularly fact-bound inquiry as to whether the time interval involved here should be deemed concurrent because of its brevity and the absence of intervening curative circumstances, because even under the "totality of circumstances" test we would consider this confession involuntary. Under that test, the burden of proving voluntariness after such flagrant police misconduct is, properly, substantial.[3] In this case, it is a standard the government has failed to satisfy. Therefore, we hold the initial confession involuntary and thus violative of due process.

## 2. The Second Confession

█ Jenkins's second confession, taken less than five hours later, suffers the same infirmity. While an initial confession, in some senses, always "lets the cat out of the bag" so that a defendant is never truly free of the disadvantages of having confessed, the Supreme Court "has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a [subsequent] usable one after those conditions have been removed." *United States v. Bayer,* 331 U.S. 532, 540–41, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654

---

**3.** While certain steps taken by the police after physical abuse or threats, such as removing the errant officers from the scene, assuring the suspect that he would no longer be harmed, establishing via colloquy that his fears had been eliminated, might cure a formerly coercive environment, *see, e.g., Scroggy,* 845 F.2d at 1392, here we find no evidence that the police acted affirmatively to dissipate the coercive environment created by their beatings and threats.

(1947). Thus, the Supreme Court has recently held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985).

By so holding, however, *Elstad* made clear that subsequent confessions are not so easily purged of taint when the initial confession was truly coerced, rather than merely technically involuntary for having preceded *Miranda* warnings. *Id.* at 312, 105 S.Ct. at 1294 ("There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question, as in this case."); *id.* at 368–69, 105 S.Ct. at 1324 (Stevens, J., dissenting) ("As I read the Court's opinion, it expressly accepts the proposition that routine *Miranda* warnings will not be sufficient to overcome the presumption of coercion and thereby make a second confession admissible when an earlier confession is tainted by coercion 'by physical violence or other deliberate means calculated to break the suspect's will.' "). In other words, by declining to treat the failure to give a *Miranda* warning before an initial confession as equivalent to "actual" coercion, *Elstad* reaffirmed that cases involving actual coercion of the initial confession require affirmative proof by the government that the taint of the earlier confession had been dissipated before the subsequent confession was taken. *See United States v. Wauneka,* 770 F.2d 1434, 1439–40 (9th Cir.1985).

■ Determining whether the taint had dissipated sufficiently is merely another way of asking whether the subsequent confession was, itself, voluntary. This inquiry "depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances." *Lyons v. Okla-homa,* 322 U.S. 596, 602, 64 S.Ct. 1208, 1212, 88 L.Ed. 1481 (1944) (citation omitted). Specifically, we look to the temporal proximity of the coercive misconduct to the confession, the presence of intervening circumstances which attenuate and dissipate the coercive effects of that misconduct, and, particularly, the purpose and flagrancy of that misconduct. *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975). As with the initial confession, it is the government's burden to prove this confession admissible. *Id.* at 604, 95 S.Ct. at 2262.

Once again, the government does not meet its burden. Aside from the government making no discernible attempt to satisfy this test in its brief, our independent analysis compels the same conclusion. Not even five hours had passed between the confessions; only ten hours had passed between the actual misconduct and the second confession. Under the circumstances of this case, insufficient time passed to conclude that the taint of the lawless police misconduct had been purged, absent significant ameliorative circumstances.

But no significant intervening circumstances which might have purged the taint from the initial coerced confession have been brought to our attention. While the egregiousness of the arresting officers' conduct may have made it difficult for the police to alleviate Jenkins's justifiable fears, we find no evidence they tried to convince Jenkins he was now safe, and certainly none that they succeeded. *See supra,* footnote 3. Indeed, Jenkins reasonably may have believed that a recantation of his initial confession might have enraged the captors he already had good reason to fear. Thus, we find that the coercive environment had not been cured by the presence of significant intervening circumstances.

Finally, *Brown* considered the flagrancy of police misconduct foremost in judging the voluntariness of a confession. *Brown,* 422 U.S. at 604, 95 S.Ct. at 2262. Here, the shocking nature of the officers' actions similarly supports our decision that the subsequent confession was involuntary.

## B. HARMLESS–ERROR ANALYSIS

Until very recently, our conclusion that Jenkins's confessions were coerced would have ended this matter. A coerced confession would have been *per se* inadmissible and its erroneous admission would have required automatic reversal. *See Lego,* 404 U.S. at 483–87, 92 S.Ct. at 623–25; *Denno,* 378 U.S. at 385–86, 84 S.Ct. at 1785–86; *Rogers v. Richmond,* 365 U.S. at 545, 81 S.Ct. at 742; *Malinski v. New York,* 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945). *See also Chapman v. California,* 386 U.S. 18, 23 & n. 8, 87 S.Ct. 824, 827–28 & n. 8, 17 L.Ed.2d 705 (some constitutional rights, including the prohibition against coerced confessions, are "so basic to a fair trial that their infraction can never be treated as harmless error"); *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). This term, however, the Supreme Court applied harmless-error analysis to a coerced confession, in *Fulminante,* 111 S.Ct. 1246, 1261 (1991). Unlike this case, the coercion found in *Fulminante* was not in the form of beatings and death threats by the police. In fact, Chief Justice Rehnquist noted the propriety of applying harmless-error analysis to the facts of *Fulminante* by emphasizing, "[t]his is especially true in a case such as this one where there are no allegations of physical violence on behalf of the police." *Id.* at 1266. Because the Court was not faced with facts that necessitated its passing on whether harmless-error analysis applies even to brutality-induced confessions, it is unclear whether the Court intended to reach that issue in *Fulminante.*

The need to resolve this vexing question here, however, is obviated by the government's forthright concession that, if we find the confessions coerced, it cannot show admission of the confessions harmless beyond a reasonable doubt. *Appellee's Supplemental Brief at 2.* We agree.

## IV. CONCLUSION

Jenkins's initial confession, coming on the heels of police beatings and death threats, was coerced. We find his second confession likewise coerced because of its close temporal proximity to the first confession, the failure of intervening circumstances to sufficiently dissipate the taint from the beatings, and the utter flagrancy of the police lawlessness. In light of the facts of this case, and the government's concession, we conclude that, even if harmless-error analysis were meant to apply here, a matter which we do not resolve, admission of the confessions was not harmless. The judgment of the district court is therefore

REVERSED.