UNITED STATES of America, Appellee,

v.

Annette BONEY, Appellant.

No. 580, Docket 77–1364.

United States Court of Appeals, Second Circuit.

Argued Jan. 12, 1978.

Decided March 9, 1978.

Jon G. Rothblatt, New York City (Henry B. Rothblatt and Rothblatt, Rothblatt, Seijas & Peskin, New York City, of counsel), for appellant.

Jonathan M. Marks, Asst. U. S. Atty., E.D.N.Y., Brooklyn, N. Y. (David G. Trager, U. S. Atty., and Harvey M. Stone, Asst. U. S. Atty., E.D.N.Y., Brooklyn, N. Y., of counsel), for appellee.

Before GURFEIN and VAN GRAAFEILAND, Circuit Judges, and DOOLING, District Judge.*

GURFEIN, Circuit Judge:

In this consolidated appeal, defendant Annette Boney appeals from judgments of conviction entered on August 18, 1977 and September 29, 1977 after jury trials in the United States District Court for the Eastern District of New York (Mishler, *Chief Judge*). At the first trial, appellant was found guilty under Count Three of the indictment of possessing with intent to distribute 20 kilograms of methaqualone, a controlled substance, in violation of 21 U.S.C. § 841(a)(1),[1] and was acquitted on one count of possession, and one count of distribution under the same section. In the second trial, appellant was found guilty of one count of conspiracy to possess and distribute methaqualone, in violation of 21 U.S.C. § 846.[2] A co-defendant, Stuart

---

* Honorable John F. Dooling, Jr., United States District Judge for the Eastern District of New York, sitting by designation.

1. 21 U.S.C. § 841(a)(1) provides in part that "it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufac-ture, distribute, or dispense, a controlled substance."

2. 21 U.S.C. § 846 provides:

"Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum

First, was acquitted.[3]

Annette Boney was originally indicted on January 27, 1977 on three substantive counts. The first count charged Boney with possessing with intent to distribute about 60,000 tablets of methaqualone (commonly called "qualudes") on November 17, 1976; the second count charged distribution on the same date; and the third count (presently on appeal) charged possession of 20 kilograms of methaqualone on December 21, 1976. On the morning of May 2, 1977, the grand jury returned a superseding indictment which was identical to the original except that it included a fourth count charging appellant and one Stuart First with conspiracy to possess and distribute approximately 129,300 tablets of methaqualone from October 22, 1976 through January 10, 1977. It was agreed that the trial on the first three counts would begin that day and that the conspiracy count would be severed.[4]

## I. THE POSSESSION TRIAL

### A. The Evidence Relating to the November 1976 Transactions (Counts I and II)

The Government's principal witness was Michael Cantor, who in return for his cooperation, had been allowed to plead guilty to a violation carrying a maximum penalty of four years' imprisonment and a $30,000 fine.

Cantor testified that he met Annette Boney in October 1976 in Dallas, Texas, while traveling as a salesman for a sweater manufacturer. Boney, who lived in Dallas, was working for one Stuart First, the manufacturer's sales representative in Texas. Appellant reportedly offered to supply Cantor with any quantity of qualudes that he wanted, and agreed to sell him twenty thousand tablets for between $1.95 and $2.00 a tablet.

On October 28 or 29, 1976, Annette Boney and Stuart First arrived in New York and provided Cantor with two suitcases of qualudes in exchange for $39,000 in cash.

Boney subsequently agreed to sell an additional forty thousand tablets to Cantor for $68,000, and on November 16, Boney arrived at Cantor's apartment with sixty thousand tablets. Robert Goldman, a friend of Cantor's, testified that he was in Cantor's apartment when Boney arrived with two suitcases containing qualudes. Counts One and Two of the indictment were based on the November 16 transaction. Appellant was acquitted on those counts.

### B. The Evidence on the December Transactions (Count Three)

Cantor was arrested by agents of the Drug Enforcement Administration on December 20, 1976, and began cooperating with the Government immediately. On December 21, Cantor recorded a telephone call from Boney, during which she told Cantor that she had sent him 25,600 qualudes by Emery Air Freight and that they could be picked up at John F. Kennedy International Airport. Boney stated that the "samples" were in a suitcase addressed to him in the care of his company. The tape recording of that conversation was played for the jury. After receiving the phone call, Cantor and agents of the Drug Enforcement Administration went to Kennedy Airport where they took custody of the suitcase. It contained approximately 25,350 methaqualone tablets.

On December 28, Cantor told appellant in another telephone conversation that the pills which he picked up from the airport had been stolen from him and someone named Jerry, and that consequently he was unable to pay her the agreed price of $50,-

---

punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

3. Upon her first conviction, Annette Boney was committed for study and report under 18 U.S.C. § 5010(e). Upon her second conviction, she was committed for study and report under

18 U.S.C. § 4205(c). Execution of her commitment has been stayed pending this appeal.

4. Though the appeals from each conviction have been consolidated, we shall state the evidence at each trial separately.

000. The recording of that conversation was also played for the jury.

On January 4, 1977, Cantor recorded another telephone conversation with appellant, in which he again related his efforts to raise the $50,000. That recording was also played for the jury.

### C. *"Constructive Possession" (Count Three)*

Count Three of the indictment charged that "on or about the 21st day of December 1976, within the Eastern District of New York, at John F. Kennedy International Airport, Jamaica, Queens, New York, the defendant Annette Boney did knowingly and intentionally possess with intent to distribute approximately 20 kilograms of Methaqualone, a Schedule II controlled substance". It is agreed that appellant did not *physically* possess the controlled substance in the Eastern District of New York. The court charged that the jury could find that appellant was in "constructive possession" of the methaqualone under the test set forth in the margin.[5]

Appellant contends that the evidence did not establish her constructive possession of the methaqualone in the Eastern District of New York, and that the charge incorrectly stated the law on "constructive possession".

■ On the morning of the trial and before it began, the Assistant U.S. Attorney explained the Government's theory of venue. He stated that, though appellant was "in Texas," she had constructive possession of the pills when she had them shipped to New York by air freight and when they arrived at Kennedy Airport. Despite this clear explanation of the basis for the venue laid, appellant failed to move to dismiss the indictment for lack of venue. Judge Mishler construed this as a waiver of any objection to venue. We agree. *United States v. Price,* 447 F.2d 23, 27 (2d Cir.), *cert. denied,* 404 U.S. 912, 92 S.Ct. 232, 30 L.Ed.2d 186 (1971).

■ It is, of course, true that the Government bears the burden of proving venue as an essential element of its case. This burden, imposed by Article III, Section 2 of the Constitution, that "such Trial shall be held in the State where the said Crimes shall have been committed" is founded upon the highest considerations of fairness in the administration of criminal justice. *United States v. Johnson,* 323 U.S. 273, 276, 65 S.Ct. 249, 89 L.Ed. 236 (1944). As Judge Lumbard wrote in *United States v. Rivera,* 388 F.2d 545 (2d Cir.), *cert. denied,* 392 U.S. 937, 88 S.Ct. 2308, 20 L.Ed.2d 1396 (1967), "venue is important as a guaranty of the defendant's right to be tried in the vicinity of his criminal activity, and venue requirements are imposed to prevent the government from choosing a favorable tribunal or one which may be unduly inconvenient to the defendant." 388 F.2d at 548. Thus, waiver of an objection to venue is not to be lightly inferred. *United States v. Price, supra,* 447 F.2d at 27; *United States v. Gross,* 276 F.2d 816, 819 (2d Cir.), *cert. denied,* 363 U.S. 831, 80 S.Ct. 1602, 4 L.Ed.2d 1525 (1960).

In this case, however, appellant made several pretrial motions but failed to object to venue. Nor did she make a motion to dismiss for lack of venue at the close of the Government's case, although she did make a general motion for a directed verdict of acquittal. That constitutes waiver. *United States v. Rivera, supra,* 338 F.2d at 548; *United States v. Price, supra,* 447 F.2d at

---

5. "One having title to and in actual possession of merchandise who thereafter ships the merchandise by carrier of his or her own choosing, by bill of lading to a purchaser, with instructions to the purchaser as to how and in what manner to receive the merchandise, retains constructive possession of the merchandise until delivery.

So, in this case, if the Government proves beyond a reasonable doubt that the accused had actual possession of the methaqualone and that sometime on or about December 17th, 1976, that she shipped the qualudes via Emery Air Freight, and that she chose Emery Air Freight as the carrier and addressed the same to Michael Cantor, with instructions as to how and where to pick up the methaqualone, I charge you if you find all that, that as a matter of law, the defendant retained constructive possession even though she had surrendered actual possession."

27. Indeed, appellant does not seriously argue that she preserved an objection to venue.[6] She contends rather that, because the Government failed to establish her constructive possession of the methaqualone in the Eastern District, no crime was proven. On that ground, she submits, the motion for acquittal should have been granted.[7]

■ Appellant contends that she did not have constructive possession over the methaqualone because she lost the power to control its disposition when she turned it over to Emery Air Freight, a common carrier. In appellant's view, the sale to Cantor was complete when she gave the luggage to the carrier.

Appellant submits further that the outcome of the criminal case should be determined by the Federal Bills of Lading Act, 49 U.S.C. § 81 *et seq.* She argues that, under the Act, when the goods shipped are "assigned" to a specified person, and the bill of lading issued by the carrier is a non-negotiable straight bill, the consignee is deemed to acquire title to the goods upon shipment, citing *G.A.C. Commercial Corp. v. Wilson,* 271 F.Supp. 242, 245–46 (S.D.N.Y. 1967). Finally, appellant suggests, somewhat paradoxically, that because the contraband was actually picked up at the airport by government agents, who had it under their control, she could not have been in constructive possession.

Neither party has cited a case directly in point, nor has our own needle-in-a-haystack type of research found one. We think, nevertheless, that there is a difference between the criminal law of possession and the commercial law of possession and title. We have said that "one having a working relationship or a sufficient association with those having physical custody of the drugs so as to enable him to assure their produc-

tion, without difficulty, to a customer as a matter of course may be held to have constructive possession." *United States v. Jones,* 308 F.2d 26, 30 (2d Cir. 1962) (en banc).

The purpose of the drug laws is to prevent drug traffic. A purpose of the commercial law is to create stability and predictability in business transactions. The concept of "property" is foreign to drug law enforcement, for all such "property" is contraband subject to forfeiture, 21 U.S.C. § 881. An illicit drug dealer does not expect a bill of sale nor a drug importer a consular invoice. A court will not pay deference to the niceties of title when the transaction involves contraband. *Cf. United States v. Pardo-Bolland,* 348 F.2d 316, 324 (2d Cir.), *cert. denied,* 382 U.S. 944, 86 S.Ct. 388, 15 L.Ed.2d 353 (1965) and *sub nom. Bruchon v. United States,* 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354 (1965) ("[p]ossession may, but need not, imply title").

In this case, if Cantor had not appeared to claim the goods, appellant could have retrieved them from the carrier. As Judge Mishler perceptively observed, she did not lose possession until the methaqualone was actually delivered. In that sense, the carrier was like any other agent whose possession was constructively that of his principal. *Cf. United States v. Hernandez,* 290 F.2d 86, 90 (2d Cir. 1961). Its orders were to carry the drugs to the place selected by appellant—the Eastern District of New York.

Nor is the circumstance that Cantor was a Government informer of any substantial importance. The constructive possession by appellant, in any case, continued into the airport which is in the Eastern District of New York. That the criminal venture was

---

6. We can understand why counsel did not attack the venue, for that would have resulted simply in a trial in a Texas District Court. On the other hand, if an attack on the failure of the Government to prove its case was successful, appellant might invoke the double jeopardy clause to bar a further prosecution in Texas.

7. Though it is an interesting question whether, once an objection to venue has been waived, it would have been enough to prove actual possession in Texas (questions of variance aside), we shall not consider this issue, since the United States Attorney has not raised it, and since we have concluded that, in any event, there was constructive possession in the Eastern District.

doomed to frustration from the beginning is of no consequence. A purveyor of drugs charged with possession with intent to distribute may be in constructive possession while he negotiates with an undercover agent even though he cannot succeed in the venture. So, too, the fact that the Government agents were in practical control of the drugs before their seizure is of no legal significance. Such control by the Government agents does not, in itself, divest the appellant of constructive possession of the same drugs. *United States v. Gitlitz*, 368 F.2d 501, 505 (2d Cir. 1966), *cert. denied,* 386 U.S. 1038, 87 S.Ct. 1492, 18 L.Ed.2d 602 (1967); *United States v. Pardo-Bolland, supra,* 348 F.2d at 323–24. Since we find that there was sufficient evidence of constructive possession by appellant to support the guilty verdict on the very grounds stated in the court's charge, we also find no merit in the attack on the charge.

## II. THE CONSPIRACY TRIAL

The trial on Count Four of the indictment charging Annette Boney and Stuart First with conspiring together and with others to distribute methaqualone began on September 26, 1977. Once again, the Government's principal witness was Michael Cantor. Cantor met First in the spring of 1976, when First, who was then working as a territorial salesman for Cantor's employer in the Southwest, offered to provide Cantor with a connection for methaqualone. In October of 1976, he introduced Cantor to Annette Boney at a showroom in Dallas. Boney agreed to sell Cantor twenty thousand tablets at $1.95 per pill and on October 30, 1976, she arrived with Stuart First at Cantor's apartment with qualudes. Cantor paid Boney $39,000 for that delivery.

Several weeks later, Boney telephoned Cantor to offer him an additional 24,000 pills. On November 29, Cantor met Boney at LaGuardia Airport. The two checked into the Plaza Hotel in Manhattan, where Boney gave the 24,000 methaqualone tablets to Cantor. The reservation card from the Plaza Hotel was received in evidence.

As in the first trial, Cantor related his December 21st telephone conversation with Annette Boney in which she informed him that she had shipped about 25,000 methaqualone tablets to Kennedy Airport by Emery Air Freight. The recording of that conversation was received in evidence and played for the jury. Cantor also related that on the evening of December 21st, he accompanied agents of the Drug Enforcement Administration to Kennedy Airport and picked up the suitcases containing about 25,350 qualudes.

As in the May trial, the recording made on December 28, 1976, between Cantor and Annette Boney, was received in evidence and played for the jury. Cantor also described a conversation that he had on December 28 with Annette Boney and Special Agent Graffam during which Boney made a demand for $50,000 which Cantor owed her for the tablets that had been seized at the airport.

Agent Lloyd N. Clifton of the Drug Enforcement Administration testified that on August 18, 1977, he executed a search warrant at a laboratory in Dallas, Texas, and recovered large quantities of chemicals, machinery, and glassware.

Over objection, the Government also called Dr. Edward Franzosa, a forensic chemist employed by the Drug Enforcement Administration. Dr. Franzosa testified that when he visited the laboratory in Dallas, in August of 1977, he found pieces of chemical apparatus, a sixteen-station tablet punchpress, and large quantities of chemicals. On the basis of these discoveries, Dr. Franzosa concluded that the product of the laboratory was methaqualone. By using the tablet press found in the laboratory, Dr. Franzosa was able to make approximately 1100 placebo tablets, which were received in evidence. Each of the tablets bore the legend "Rorer 714", which was inscribed by steel punches. A microscopic examination of a sample of tablets taken from the suitcase recovered at Kennedy airport revealed the same legend. By comparing microscopic tool marks such as lumps, nicks, gouges and ridges on the face of the sample tablets, Dr. Franzosa reached

the conclusion that the tablets in the suitcase were made on the punches which he found in the laboratory in Dallas.

Boney called no witnesses and presented no evidence.

■ Appellant argues that the Government's failure to provide adequate notice of its intent to introduce expert testimony concerning "ballistic" comparison tests of the seized methaqualone and its failure to produce the reports of the tests as well as the presses used in conducting them requires a new trial on Count Four.

Appellant quite rightly points out that the "ballistic" comparison procedure performed by the Government's witness, Dr. Franzosa, was subject to production before the trial under Rule 16. We agree also that sufficient demand was made by the defendant to have required its production before the trial. If we were to read this record as a "trial by ambush", *United States v. Kelly*, 420 F.2d 26, 29 (2d Cir. 1969), we would not hesitate to reverse. The sequence of events must be considered, however. The examination of the chemicals and equipment seized by the Drug Enforcement Administration began with an inventory on August 18, 1977. It was not until mid-September, about ten days before trial, that the Assistant U.S. Attorney first learned that Dr. Franzosa would be able to link the tablets seized at Kennedy Airport with the placebos made in the Dallas laboratory. The Assistant U.S. Attorney decided to call him as a witness only a few days before trial, and on the day trial commenced he told defense counsel the substance of Dr. Franzosa's proposed testimony. The Assistant U.S. Attorney did not himself receive the written laboratory test report until the next day, and immediately gave a copy to defense counsel.

When appellant objected to this expert testimony on the ground that the Government had failed to comply with Rule 16, Judge Mishler offered a continuance to enable appellant to get her own expert. Yet, after the examination of Dr. Franzosa, appellant did not seek a continuance. The issue was dropped. We think the judge

acted fairly in this rather unusual situation. Appellant cannot now claim that the lack of advance notice entitles her to a new trial, particularly since, unlike appellant in *Kelly, supra*, she was offered a continuance. *United States v. Russo*, 480 F.2d 1228, 1243 (6th Cir. 1973), *cert. denied*, 414 U.S. 1157, 94 S.Ct. 915, 39 L.Ed.2d 109 (1974).

In so holding, we emphasize that the prosecutor should have informed defense counsel that he had decided to call Dr. Franzosa as a witness as soon as he had made that decision. At oral argument, the prosecutor pleaded *mea culpa* and stated that, in the pressure of trial preparation, he simply forgot to notify his adversary until a few days later, the first day of the trial. We do not doubt the good faith of the prosecutor, but we would have taken a serious view of the matter if the trial judge had not offered a continuance. The failure of appellant to avail herself of the offer makes it doubtful that the production of another expert was necessary, particularly since the scientific examination consisted of nothing more than a visual microscopic comparison on two sets of tablets.

In any event, Dr. Franzosa's testimony was a relatively insignificant piece of evidence in the totality of the Government's case. Cantor's testimony, corroborated by documentary evidence such as hotel registration records together with the tape recording of a telephone conversation in which appellant acknowledged having shipped the methaqualone tablets recovered at Kennedy Airport was more than ample to establish defendant's guilt. Dr. Franzosa's testimony was merely cumulative of other evidence sufficient to demonstrate appellant's participation in the conspiracy to distribute methaqualone.

## III. THE CLAIM OF UNCONSTITUTIONAL DELEGATION

■ When 21 U.S.C. § 812(c) was enacted by Congress, methaqualone was not included as a controlled substance. It was added to Schedule II administratively in 1973 by the Attorney General pursuant to the provi-

**404**

sions of 21 U.S.C. § 811. Appellant timely challenged the constitutionality of 28 U.S.C. § 811 as an unlawful delegation of legislative power in violation of Article 1, Section 1, and the Fifth Amendment.

We rejected this claim in *United States v. Pastor,* 557 F.2d 930, 939 (2d Cir. 1977). Though Pastor involved the adding of drugs to Schedules III and IV, while methaqualone was added to Schedule II, we see no distinction based on that difference.

The judgments of conviction are affirmed.