**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-4495

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

STEPHEN WAYNE PURKS, a/k/a City,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg.  Elizabeth K. Dillon, Chief District Judge.  (5:21-cr-00007-EKD-JCH-3)

Argued:  March 18, 2025                                    Decided:  June 5, 2025

Before GREGORY and HARRIS, Circuit Judges, and KEENAN, Senior Circuit Judge.

Affirmed by published opinion.  Judge Gregory wrote the opinion, in which Judge Harris and Judge Keenan joined.

**ARGUED:**  Aaron Lee Cook, AARON L. COOK, PC, Harrisonburg, Virginia, for Appellants.  S. Cagle Juhan, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.  **ON BRIEF:**  Gerald T. Zerkin, Richmond, Virginia, for Appellant Natassia Nicole Kimble.  Lawrence H. Woodward, Jr., RULOFF, SWAIN, HADDAD, MORECOCK, TALBERT & WOODWARD, P.C., Virginia Beach, Virginia, for Appellant Carlos Bariola.  Christopher R. Kavanaugh, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.

GREGORY, Circuit Judge:

From his Florida state prison cell, Stephen Purks orchestrated a multi-person, multi-state methamphetamine distribution conspiracy. The government brought a seventeen-count indictment against nine defendants and charged Purks with fourteen counts of distribution of methamphetamine, in violation of 21 U.S.C. § 841(a), and one count of conspiracy to distribute and to possess with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 846. A jury found Stephen Purks guilty on all counts.

Purks challenges his convictions on two grounds. First, he appeals the district court's denial of his motion to suppress statements he made to law enforcement. Second, he argues that the government prosecuted him in an improper venue. We hold that the district court properly considered Purks's statements and that venue was proper.

I.

A.

Prior to trial, Purks moved to suppress statements he made in an interview with Drug Enforcement Administration ("DEA") Special Agent Thomas Hickey. *See* J.A. 68. Purks had been serving a Florida state prison sentence on unrelated state charges during his running of the conspiracy and the subsequent investigation, including the interview at issue. J.A. 2630. He argued that Florida Department of Corrections ("FDOC") officers had beaten him and that his statements during the subsequent interview were involuntarily given. J.A. 2615–17.

2

The district court took evidence regarding the motion to suppress at an evidentiary hearing. Hickey testified that he interviewed Purks while Purks was in FDOC custody. J.A. 88–89. Hickey testified that two other agents—a Virginia police officer and another DEA agent—joined him. J.A. 89. Only the three agents and Purks were in the room during the interview. J.A. 92–93.

According to Hickey, after explaining to Purks that a Virginia grand jury had indicted him and that law enforcement had searched his Facebook account, Hickey read Purks his *Miranda* rights, J.A. 98; *see Miranda v. Arizona*, 384 U.S. 436 (1966), and Purks stated that he was willing to answer Hickey's questions, J.A. 102. Hickey reported that during the course of the interview, Purks "was very cordial, very respectful, but he was kind of giddy." J.A. 104. Hickey testified that the agents were not armed, did not touch Purks, and did not threaten him. J.A. 97. In an exchange with government counsel, Hickey also testified:

> Q: Did [Purks] ever place limits on what he would talk about?
> A: He did.
> Q: Okay. What sort of limits did he place?
> A: So we started talking about the females that he had working for him. And he made the comment that he wasn't going to talk about the females because he felt that that would, you know, put weight on him, you know.
> Q: Was he willing to answer questions about [other co-defendants]?
> A: He was. He was.
> *Q: At any time during your discussion with him, did he ask for a lawyer?*
> *A: He did not.*
> Q: Okay. At any time in your discussion with him, did he ever ask to stop the interview?
> A: He did not.

3

Q: Okay. At any time during your conversation with him, did he refuse to answer -- just stop answering questions generally?

A: He did not.

J.A. 103–04 (emphasis added); *see also* J.A. 116 (Hickey reiterating that Purks never asked for a lawyer).

Hickey said he asked Purks about a contraband cell phone that FDOC officers had found in his rectum. J.A. 102. Purks admitted to having it and said that the FDOC officers had "beaten" him because of it. *Id*. Hickey said during the interview Purks was in a wheelchair and would "grimace and moan." J.A. 107. On "multiple occasions," Hickey stopped to ask if Purks wanted to continue, to which he always responded in the affirmative. *Id*.

Purks also testified at the suppression hearing. Purks stated that a couple days prior to his interview with Hickey, FDOC officers removed him from his cell and demanded that he hand over his phone. J.A. 119–20, 140–41. When Purks did not, the prison guards got increasingly physical. J.A. 119–20. Purks testified that he:

> was slammed on [a] gate and slammed on the ground. And [the prison guards] had a canine guy there and just some other officers by the gate, and drove me up front to administration, and was proceeding to say they knew I had a phone and to give it to them. I was saying I didn't have a phone, at which point they were stomping on my back, but my hands were up behind my back, and telling me, like, You're going to give it. You need to shit it out. You know, things of that nature. And I was like, You can have the phone.

*Id*. Purks stated that only FDOC officers attacked him and that no DEA agents, including Hickey, took part in the assault nor did the Virginia police officer. J.A. 140. But he stated that he believed that the FDOC officers only assaulted him because the federal agents "put

4

them up to [it]." J.A. 127. As a result of the assault, Purks reported that his "back got to where I couldn't even straighten it, and it was spasming" and he was confined to a wheelchair. J.A. 120. Following the assault, the Florida prison placed Purks in solitary confinement, released him for a short period of time "just [for him] to get attacked" by a fellow inmate, and then returned him to solitary confinement. J.A. 121, 131.

As for his recounting of the interview itself, Purks largely corroborated Hickey's testimony. Purks acknowledged that Hickey read him his *Miranda* rights and asked him if he was willing to answer questions. J.A. 122. Purks answered some of Hickey's questions, *id.*, but refused to answer others, J.A. 144. Purks explained the interview "wasn't no disrespectful things, or us yelling back and forth at each other or nothing like that. It wasn't nothing like that." J.A. 122. Purks stated "You know, I'm not arguing some of the things [Hickey is] saying now . . . . I'm not even saying he threatened me or anything like that." J.A. 127; *see also* J.A. 132. Purks affirmed that none of the agents threatened him, made any promises to him, and he did not know whether any of them were armed. J.A. 133. In fact, in Purks's own words, the agents "were being friendly" throughout the conversation. J.A. 139.

Eventually, Purks said he asked for a lawyer. J.A. 123. Hickey then left the room with one of the other officers and, after a couple of minutes, came back and told Purks "somebody had to come get [Purks], or whatever," but "then they kept trying to talk to [him]." J.A. 125. As Purks explained, "[h]e asked me [a] question, and I answered smart-alecky, and then it just went away from there. They were trying to talk to me and then slide things in while we were waiting on the [FDOC] officers to come get me." J.A. 146–47.

5

The district court denied Purks's motion to suppress in a written opinion. *See* J.A. 2629–39. It first held that Purks was not in custody for purposes of *Miranda*, J.A. 2635–36, but, "even assuming that Purks was in custody[,] . . . the court credit[ed] SA Hickey's unequivocal testimony that Purks never asked for a lawyer over Purks' testimony that he did invoke a right to counsel," J.A. 2637. The district court also held that Purks made his statements voluntarily. J.A. 2637–38. It stated that "the totality of the circumstances indicates that the conversation itself was voluntary, respectful, and at times even friendly." J.A. 2637. The district court made no findings as to whether the assault actually happened but held "even assuming the truth of Purks' testimony regarding the beating he allegedly endured two days before the meeting, the evidence does not demonstrate that the federal agents ordered that beating or otherwise coerced Purks to answer their questions under threat of a future beating." J.A. 2638. While Hickey did ask FDOC to retrieve Purks's contraband phone from him, the district court held that "[Hickey] did not ask that the cell phone be taken by force, nor does the evidence support a finding that the federal agents even knew Purks was allegedly beaten until he told them at the interview." *Id*.

### B.

Purks proceeded to trial along with several co-defendants. The government submitted significant evidence showing that, while in custody for an unrelated offense, Purks directed several Florida-based co-conspirators to ship methamphetamine from Florida to other co-conspirators in West Virginia and Virginia. *See e.g.*, J.A. 607–10, 983–84, 1030, 1259, 1426–30. Once alerted to the conspiracy, the government tracked several packages sent from Florida to Catherine Rec, a co-conspirator living and receiving

6

packages in the Western District of Virginia.  The government intercepted some packages and allowed the delivery of others.  In all, the government tracked fourteen different packages containing methamphetamine that were addressed to Rec.[1]  *See* J.A. 40–46.

After the government rested, Purks moved under Federal Rule of Criminal Procedure 29 to dismiss the indictment for improper venue.  J.A. 1631–32.  The district court denied his motion.  J.A. 1683.  The district court instructed the jury on venue, explaining:

> The indictment alleges that some acts in furtherance of the crimes charged occurred in the Western District of Virginia.  There is no requirement that all aspects of the crimes charged take place here in the Western District of Virginia.  An offense committed in more than one district may be prosecuted in any district where such offense was begun, continued, or completed, or where a physical act by a defendant in furtherance of the crime charged took place.

J.A. 1827.  The jury returned a verdict of guilty on all counts as to all defendants, J.A. 2488–99, and the district court sentenced Purks to 300 months, J.A. 2642.  Purks appealed.

## II.

We first address Purks's appeal of the district court's denial of his motion to suppress statements he made to law enforcement.  Because Purks's statements to law enforcement were voluntary, we affirm the district court's denial of his motion to suppress.

---

[1] The government based the indictment for Counts 3 through 10 on packages of drugs that the postal service delivered to Rec's home in the Western District of Virginia. The government also based Count 10 on drugs that it seized at Rec's home and based Counts 12 through 17 on packages addressed to Rec that it seized at a post office within the district.  J.A. 761–852; J.A. 2777.

7

"The Self–Incrimination Clause of the Fifth Amendment guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Withrow v. Williams*, 507 U.S. 680, 688 (1993) (quoting U.S. Const., amend. V). "A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda v. Arizona* . . . and the defendant knowingly, intelligently, and voluntar[ily] waives those rights." *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017) (citation and quotation marks omitted). If these requirements are met, "confessions remain a proper element in law enforcement" and "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (quoting *Miranda*, 384 U.S. at 478) (cleaned up).

The government bears the burden by the preponderance of evidence to show that a statement was voluntary. *Giddins*, 858 F.3d at 881. "An appellate court must make an independent determination on the issue of voluntariness." *United States v. Pelton*, 835 F.2d 1067, 1072 (4th Cir. 1987). But, "[w]hen reviewing the district court's denial of a motion to suppress, we review factual findings for clear" error, *Giddins*, 858 F.3d at 878–79 (quotation marks and citation omitted), and "particularly defer to a district court's credibility determinations, for it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress," *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021) (quoting *United States v. Palmer*, 820 F.3d 640, 653 (4th Cir. 2016)).

## A.

We hold that law enforcement complied with *Miranda*'s procedural requirements. Under *Miranda*, "the prosecution may not use statements, whether exculpatory or

8

inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444.

*Miranda* requires that, "[p]rior to any questioning," law enforcement must inform the suspect of his rights. *Id*. It is uncontested that Hickey read Purks his *Miranda* rights. J.A. 122.

*Miranda* also states that if a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." 384 U.S. at 444–45. On this matter, the parties split. Purks states that he asked for a lawyer; the government insists he did not. At the suppression hearing, the district court heard conflicting testimony and "credit[ed] . . . Hickey's unequivocal testimony that Purks never asked for a lawyer over Purks' testimony that he did invoke a right to counsel." J.A. 2637. This is the quintessential credibility determination to which we defer to the district court. *See Pulley*, 987 F.3d at 376.

Beyond arguing that the district court should have credited Purks's testimony over Hickey's, Purks put forth no argument that the district court clearly erred. Therefore, we find that it did not.[2] Because law enforcement read Purks his rights and Purks never invoked his right to an attorney, there was no *Miranda* violation.

---

[2] The parties spill considerable ink disputing whether, for the purposes of *Miranda*, Purks was in custody at the time of the interrogation. Since we find that the government complied with *Miranda*'s dictates, we assume without deciding that he was.

B.

Compliance with *Miranda*'s procedural safeguards is, however, necessary but not sufficient. *See Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("We do not suggest that compliance with *Miranda* conclusively establishes the voluntariness of a subsequent confession."). Even if the government complied with *Miranda*, a confession is inadmissible unless it was "voluntarily" given. *Withrow*, 507 U.S. at 689. Citing the alleged FDOC assault, Purks argues that his statements "were the product of actual physical coercion or the perceived threat of additional physical injury," rendering them involuntary. Opening Br. at 19. We disagree and hold that Purks's statements were voluntary.

"The test for determining whether a statement is voluntary under the Due Process Clause 'is whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence.'" *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976)) (alterations removed). "[W]e examine[] the totality of circumstances to determine whether a confession had been made freely, voluntarily and without compulsion or inducement of any sort." *Withrow*, 507 U.S. at 689. This is a difficult standard to meet—"maintaining that a statement is involuntary even though given after [*Miranda*] warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." *Missouri v. Seibert*, 542 U.S. 600, 609 (2004) (plurality opinion); *Berkemer*, 468 U.S. at 433 n.20 ("cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to

10

the dictates of *Miranda* are rare."). "Coercive police activity is a necessary finding for a confession or a *Miranda* waiver to be considered involuntary," *Giddins*, 858 F.3d at 881, and the existence of "[c]oercion is determined from the perspective of the suspect," *Perkins*, 496 U.S. at 296. But, while necessary, coercion alone is insufficient for a finding of involuntariness. *Giddins*, 858 F.3d at 885. As this Court has held, "[t]he mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary. The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination is critically impaired." *Id.* at 881 (quoting *Braxton*, 112 F.3d at 780).

To date, neither we nor the Supreme Court have provided clarity on when the effects of a prior beating have subsided such that a later confession is voluntary. The Supreme Court has, however, addressed whether, when one confession was "actually coerced," a second confession is likewise tainted. *See Oregon v. Elstad*, 470 U.S. 298, 310 (1985). As with all voluntariness decisions, the Supreme Court adopted a multi-factor, fact-specific framework. It instructed: "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id*. While not directly on point, the *Elstad* framework provides some guidance in the factors the Court should consider.

In *United States v. Jenkins*, the Ninth Circuit considered two confessions obtained from the same defendant under similar circumstances to those here. 938 F.2d 934 (9th Cir. 1991). There, the police beat and threatened the defendant with death during and after his

11

arrest. *Id.* at 936. Once in custody, the defendant went to the hospital and police questioned him at 2 a.m., at which point he confessed for the first time. *Id.* at 939. The Ninth Circuit held that the defendant's first confession was involuntary. As the court explained, "a brief period of time, consumed almost exclusively by his hospital treatment, passed without any curative measures aimed at dissipating the coercive environment." *Id.* at 940. The defendant confessed for a second time about five hours later. Echoing *Elstad*, the Ninth Circuit again looked to "the temporal proximity of the coercive misconduct to the confession, the presence of intervening circumstances which attenuate and dissipate the coercive effects of that misconduct, and, particularly, the purpose and flagrancy of that misconduct," and held that the defendant's second confession was also involuntary. *Id.* at 941. The Ninth Circuit suppressed both statements.

In *United States v. Olaniyi*, the Eleventh Circuit likewise considered in an unpublished opinion the voluntariness of a confession made after a police beating. 796 F. App'x 601 (11th Cir. 2019). In that case, Malaysian police officers arrested the defendant in Malaysia. *Id.* at 602. During the course of the arrest, the Malaysian officers allegedly beat the defendant. *Id.* at 603. After the arrest, American FBI agents read the defendant his *Miranda* rights and interviewed him. *Id.* at 604. The interview itself did not raise any additional constitutional concerns—it lasted less than two hours and, throughout it, the American officers used a conversational tone. *Id.* The Eleventh Circuit found that the defendant's "confession [to the Americans] was not causally linked to the [Malaysian] officers' alleged beating." *Id.* The "interview occurred hours after his arrest by different officials from a different sovereign" and the American agents "did not participate in the

12

arrest and were not aware of [the] alleged beating." *Id.* Looking to the totality of the circumstances, the Eleventh Circuit held that the defendant's statements were voluntary.

Like the district court, we assume without deciding that the assault occurred and Purks's description of it is accurate. Looking to the totality of the circumstances and guided by the factors outlined in *Elstad*, further informed by *Jenkins* and *Olaniyi*—including the time between the interview and the beating, the intervening circumstances and the officers' identities, and the tone of the interview—we hold that Purks's "will" was not "overborne" nor was "his capacity for self-determination [so] critically impaired" as to render his statements involuntarily made. *Giddins*, 858 F.3d at 881.

First, the beating was temporally removed from the interview. Though the record is unclear as to the exact timeline, Purks agreed that "a couple of days" passed between the alleged beating and the interview. J.A. 140; *see also* J.A. 2630. Unlike in *Jenkins*, Purks had more than a few hours to recover from the ordeal. Although still recovering from the alleged beating, Purks testified that he was not in so much pain that it clouded his understanding of what was happening. J.A. 134. This weighs in favor of a finding of voluntariness.

Second, in terms of intervening circumstances, like in *Olaniyi* and as *Elstad* instructs us to consider, different agents from different agencies committed the alleged beating and conducted the interview. As the district court found, the agents who interviewed Purks were not involved in the alleged beating nor did they order it. J.A. 2638. Purks himself acknowledged that no DEA agents were involved in the assault against him. J.A. 140. Furthermore, Purks testified that no FDOC officers were present during the interview. J.A.

13

135. The fact that it was readily apparent to Purks that different officers from different entities were involved reduces the coercive effects of the earlier alleged beating.

Third, turning to the interview with the federal agents, the district court held that "the conversation itself was voluntary, respectful, and at times even friendly" and "[a]t no point during the conversation did the agents touch, yell at, or threaten [Purks]." J.A. 2637–38. Purks himself said that the officers were "being friendly" with him. J.A. 139. Prior to asking any substantive questions, Hickey "asked Purks if he was willing to answer questions, to which he said he was." J.A. 2638; *see also* J.A. 122. Additionally, it is undisputed that Hickey read Purks his *Miranda* rights. *Id.* Though within the prison complex where Purks was incarcerated, the interview took place in an "office," not an interrogation room. J.A. 142–43. This makes the interview similar to the one in *Olaniyi*. Though it is not entirely clear how long the interrogation lasted, it appeared to be short. Hickey testified that it lasted "about an hour, maybe less than an hour." J.A. 108. Purks testified "I wouldn't say it was an hour, but it was a little while." J.A. 126. In other words, agents did not grill Purks for hours attempting to wear down his will. *See also Olaniyi*, 796 F. App'x at 604 (noting that the interview lasted less than two hours). They engaged in a brief and cordial conversation.

Finally, and perhaps most importantly, Purks *did* decline to answer some of Hickey's questions. Purks testified that "[t]hey asked me questions. I didn't answer them." J.A. 139; *see also* J.A. 144 ("THE COURT: And there were questions that were asked of you that you just refused to answer; is that right? THE DEFENDANT: Yes, ma'am.").

14

The fact that Purks answered some but not all of Hickey's questions strongly suggests that his will was not overcome so as to render his statements involuntary.

Taken together, the circumstances support a finding that Purks's statements to the federal agents were voluntary. Even assuming the FDOC beating occurred, its shadow was not so long as to rob Purks of his will. Thus, we affirm the district court's denial of Purks's motion to suppress.

## III.

Purks also appealed the district court's denial of his Motion for a Judgment of Acquittal, arguing that the Western District of Virginia was not a proper venue to try him for fourteen counts of distribution of methamphetamine.[3] *See* Fed. R. Crim. P. 29.[4] But, "[b]ecause the venue question was submitted to the jury, . . . [Purks's] appellate contention is properly framed as an assertion that the court's venue instruction on the [distribution counts] was flawed as a matter of law." *United States v. Ebersole*, 411 F.3d 517, 526 (4th Cir. 2005). We review the content of jury instructions for abuse of discretion[5] and, "[b]y

---

[3] A grand jury also indicted Purks for—and the jury found him guilty of—one count of conspiracy to distribute methamphetamine. Purks does not challenge venue for that count.

[4] Rule 29 states: "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

[5] Purks failed to challenge the district court's jury instruction on venue, *see* J.A. 1686–87, and, normally, that failure to preserve an objection would result in plain error review, *United States v. McCabe*, 103 F.4th 259, 278 (4th Cir.), *cert. denied*, 145 S. Ct. 399 (2024). However, "a claim of instructional error may alternatively be preserved by an
(Continued)

15

definition, a court abuses its discretion when it makes an error of law." *Id.* at 526–27 (cleaned up); *see also United States v. Gallagher*, 90 F.4th 182, 195 (4th Cir. 2024). Here, the question before this Court is whether the district court erred as a matter of law in instructing the jury. We find that it did not.

### A.

The Constitution provides that "[t]rial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. "When, as here, a defendant is charged with multiple criminal counts, venue must lie as to each count." *United States v. Engle*, 676 F.3d 405, 413 (4th Cir. 2012).[6] "[V]enue is a question of fact in which the burden of proof rests with the government, but unlike other facts in the government's case, it may be proven by mere preponderance of the evidence." *Id.* at 412.

---

objection in a directed verdict motion made pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure." *Ebersole*, 411 F.3d at 526; *see also McCabe*, 103 F.4th at 278–79 (noting the *Ebersole* Rule 29 preservation rule). Purks's Rule 29 motion raised the venue issue and therefore serves to preserve Purks's objection to the venue jury instruction.

[6] For this reason, the government's attempt to invoke *Pinkerton* liability fails. *See Pinkerton v. United States*, 328 U.S. 640 (1946) (holding that a defendant may be held liable for the substantive offenses of their co-conspirators). The government argues that venue is proper anywhere that an offense in support of the conspiracy took place. But, while that is true for the *conspiracy* count, it does not necessarily hold true for the substantive distribution counts. In another drug conspiracy case, the Ninth Circuit considered and rejected a similar argument. As the court there explained, "[w]hat the government is essentially arguing for is a rule of law allowing venue over a substantive crime committed in furtherance of a conspiracy in any district where venue is proper for the conspiracy charge." *United States v. Corona*, 34 F.3d 876, 879 (9th Cir. 1994). But, "[w]hile such a rule might make some sense from a policy standpoint, it runs counter to the venue principles established by the Constitution, the Federal Rules of Criminal Procedure, and the federal courts," namely that venue must be established as to each count. *Id.*

16

Because distribution for methamphetamine does not include a specific venue provision, "venue must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Smith*, 452 F.3d 323, 334 (4th Cir. 2006). This is a two-step inquiry. First, the Court must "identify the conduct constituting the offense . . . because venue on a count is proper only in a district in which an essential conduct element of the offense took place." *Id.* (cleaned up). When determining the nature of the conduct, Congress's choice of verb is a crucial—but not the only—consideration. 2 Fed. Prac. & Proc. Crim. § 302 (4th ed.). Second, the court "must . . . determine where the criminal conduct was committed." *Smith*, 452 F.3d at 334. "The focus, however, is on the place, not on the person, and the defendant need not have been present in the district where the crime was committed." *United States v. Wilson*, 262 F.3d 305, 320 (4th Cir. 2001).

"[T]he inquiry into the place of the crime may yield more than one appropriate venue, or even a venue in which the defendant has never set foot." *United States v. Stewart*, 256 F.3d 231, 242 (4th Cir. 2001) (cleaned up). "Where venue requirements are met, the prosecution may proceed in that district, notwithstanding the possibility that the gravamen of the wrongdoing took place elsewhere." *Engle*, 676 F.3d at 413 (cleaned up); *see also Smith*, 452 F.3d at 336 ("While the government may well have been able to try defendants in other districts, our venue rules make clear that where venue lies, the choice among acceptable fora is one for the prosecution.").

## B.

The government argues that venue was proper in the Western District of Virginia under 18 U.S.C. § 3237(a), the federal venue statute governing continuing offenses. That

17

provision states: "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in *which such offense was begun, continued, or completed*."  18 U.S.C. § 3237(a) (emphasis added).  The district court pulled from § 3237(a) in crafting its venue jury instruction.  *See* J.A. 1827.  To determine if the district court's jury instruction was correct, we must determine (1) whether Purks's offense of conviction—drug distribution— is a continuing offense and (2) where the "criminal conduct occurred," i.e. whether that offense was "begun, continued, or completed" in the Western District of Virginia.  We hold that both requirements are satisfied and that the district court properly instructed the jury on venue.

1.

"A continuing offense is a continuous, unlawful act or series of acts set afoot by a single impulse and operated by an unintermittent force, however long a time it may occupy."  2 Fed. Prac. & Proc. Crim. § 303 (4th ed.) (quoting *United States v. Midstate Horticultural Co.*, 306 U.S. 161, 166 (1939)).  Put more succinctly: "[c]rimes that . . . span space and time . . . may be considered continuing offenses."  *Corona*, 34 F.3d at 879; *see also United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999) (quoting *United States v. Lombardo*, 241 U.S. 73, 77 (1916) (when "a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done.")).

To determine if an offense is continuing, we first look at its elements.  Purks violated 21 U.S.C. § 841(a), which states:  "it shall be unlawful for any person knowingly or

18

intentionally-- (1) to . . . distribute . . . a controlled substance." *See also United States v. Randall*, 171 F.3d 195, 209 (4th Cir. 1999) ("[t]he elements of distribution of a narcotic controlled substance are as follows:  (1) distribution of the narcotic controlled substance, (2) knowledge of the distribution, and (3) intent to distribute the narcotic controlled substance."). The statute defines the term "distribute" as "to deliver." 21 U.S.C. § 802(11). It then defines "deliver" or "delivery" to "mean the actual, constructive, or attempted *transfer* of a controlled substance or a listed chemical." 21 U.S.C. § 802(8) (emphasis added).

As the Seventh and Eleventh Circuits have held, "[d]istribution of drugs can be a continuing offense, and thus governed by § 3237(a) for purposes of venue, where there are multiple acts of the defendant which constituted distribution." *United States v. Tingle*, 183 F.3d 719, 727 (7th Cir. 1999); *United States v. Brunty*, 701 F.2d 1375, 1381 (11th Cir. 1983).[7]  These opinions are well-reasoned, and we see no reason to part from our sister circuits. Purks committed multiple acts of distribution, each of which spanned both time and space, and we therefore hold that he committed multiple continuing offenses.

First, Purks's acts of distribution spanned time. "'[D]istribute' is defined broadly under § 841(a)(1)," *United States v. Cortes-Caban*, 691 F.3d 1, 17 (1st Cir. 2012), and "includes . . . acts perpetrated in furtherance of a transfer or sale, such as arranging or

---

[7] Other circuits have held that distribution is not a continuing offense for purposes of combining and prosecuting offenses. *United States v. Rowe*, 919 F.3d 752, 759 (3d Cir. 2019) (gathering cases). But, as the Third Circuit explained, this question is distinct from whether distribution is a continuing offense for purpose of establishing venue. *Id*. at 759 n.3.  Our holding here—limited to the question of venue—does not conflict with this line of cases.

19

supervising the delivery, or negotiating for or receiving the purchase price," *United States v. Colon*, 268 F.3d 367, 377 (6th Cir. 2001).[8]  Given that the act of distribution includes both the negotiation *and* effectuation of a transfer, a single act of distribution can span time. Here, Purks directed the transfer of the drugs and supervised their delivery.  The act of delivery alone took place over a period of time as the package traveled up the East Coast.

Next, the act of distribution also spanned different locations.  "To transfer," which satisfies the distribution element, means 'to carry or take from one person or place to another . . . ; to move or send to a different location . . . ; to cause to pass from one person or thing to another.'"  *Cortes-Caban*, 691 F.3d at 17 (quoting Webster's Third New International Dictionary 2426–27 (1993)).  It does not simply mean the moment when the defendant "fully relinquish[es] possession" or receives the payment.  *Brunty*, 701 F.2d at 1380–82.  This is because, "[c]onspicuously, the operative term 'transfer' is nowhere qualified or limited, by the phrase 'of possession' or otherwise."  *Id.* at 1380.  This means that a "transfer" of drugs can span various different locations.  This is true here:  The drugs traveled a significant distance—from Florida to Virginia.

---

[8] *See also United States v. Pruitt*, 487 F.2d 1241, 1245 (8th Cir. 1973) (§ 841 applies to "[a]ny individual who participates in any manner in the unauthorized distribution of such 'controlled substances'"); *United States v. Wigley*, 627 F.2d 224, 226 (10th Cir. 1980) ("Activities in furtherance of the ultimate sale such as vouching for the quality of the drugs, negotiating for or receiving the price, and supplying or delivering the drug are sufficient to establish distribution."); *Brunty*, 701 F.2d at 1381 ("[D]istribution may also consist of or include other acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or negotiating for or receiving the purchase price."); *cf. United States v. Washington*, 41 F.3d 917, 919 (4th Cir. 1994) (noting that, with § 841, "Congress intended to proscribe a range of conduct broader than the mere sale of narcotics.").

20

Spanning both different times and different locations, Purks's acts of distribution are continuing offenses.

2.

Having found that distribution is a continuing offense, we must then determine the location of the criminal conduct, defined under the statute as where the offense was "begun, continued, or completed." Under the prosecution's theory, venue is proper in the Western District of Virginia because Purks completed the act of distribution there. We agree and hold that each of Purks's acts of distribution were completed when the drugs reached their intended recipient or were seized by law enforcement—not when he lost physical possession of them nor where he directed the transfers from. Because that completion occurred in the Western District of Virginia, venue there was proper.

While courts have not had many occasions to consider this question in the context of drug distribution, they have explored similar statutes relating to a different type of contraband: obscene materials. In the context of mailing obscene materials, venue is proper at the place of delivery. 2 Fed. Prac. & Proc. Crim. § 302 (4th ed.). Congress originally criminalized the "knowing deposit" of obscene materials in the mail. *Id.* Under that version of the statute, courts held that venue only laid in the district where the materials were mailed. *Id.* Congress, unhappy with the limitations on venue, changed the statute to prohibit "knowingly us[ing] the mails for the mailing . . . or *delivery*" of obscene matter. *Id.* (quoting 18 U.S.C. § 1461) (emphasis added). As Wright & Miller explain, "[t]his change in the statutory verb was held to produce a change in result, and to permit prosecution in the district in which the publication *is delivered*." *Id.* (emphasis added); *see also United States v.*

21

*Bagnell*, 679 F.2d 826, 831 n.7 (11th Cir. 1982) (describing Congress's amendment and Congress's desire to expand venue). Here, the drug distribution statute also defines the operative offense as the "delivery" of contraband. *See* 21 U.S.C. § 802(11) (defining "distribute" as "to deliver"). This suggests that, as with the obscenity distribution provision, Congress also intended for venue to lie at the place of delivery.

Though not with the distribution statute, Courts of Appeals, including this one, have held that drug crimes can be prosecuted in the venue of the drugs' final destination. For example, this Court has held that the offense of "importing" marijuana is a continuing offense that is completed—and therefore prosecutable—at the drugs' final destination. *United States v. Lowry*, 675 F.2d 593, 596 (4th Cir. 1982) (discussing venue for violations of 21 U.S.C. § 952(a)). In *Lowry*, the defendant, located in Miami, purchased marijuana from Jamaica and then mailed it to the Eastern District of North Carolina. *Id.* at 594–95. This Court held that the Eastern District of North Carolina was a proper venue because "[t]he importation of controlled substances . . . is a 'continuous crime' that is not complete until the controlled substance reaches its final destination and venue is proper in any district along the way." *Id.* at 596 (cleaned up). Under this reasoning, the crime was not completed until the drugs were delivered in North Carolina. Other courts have likewise held that venue for the offense of "smuggling" drugs in the United States may lie at the drugs' final destination, not just their point of entry. *See, e.g.*, *United States v. Godwin*, 546 F.2d 145, 147–48 (5th Cir. 1977) (discussing venue for violations of 21 U.S.C. § 176a). Indeed, the Supreme Court sweepingly stated that "a defendant charged with illegally shipping goods may be tried in any State through which the goods were illegally transported." *Smith v.*

22

*United States*, 599 U.S. 236, 244 (2023) (citing *Armour Packing Co. v. United States*, 209 U.S. 56, 76 (1908)).

It is true that this rule—which impliedly avers that a defendant retains an interest in contraband even after it has been given to a common carrier—conflicts with the general law regarding commercial transactions. The Second Circuit in *United States v. Boney*, 572 F.2d 397 (2d Cir. 1978) tackled this conflict head-on. There, the court held that the Eastern District of New York was the proper venue for a count of possession with intent to distribute drugs. *Id.* at 400–02. The defendant had used a common carrier to mail drugs from Texas to New York. *Id.* at 401. She argued "that she did not have constructive possession over the [drugs in New York] because she lost the power to control its disposition when she turned it over to . . . [the] common carrier [in Texas]." *Id.* In her view, "the sale . . . was complete when she gave the luggage to the carrier." *Id.* The Second Circuit disagreed. Acknowledging that, in normal commercial transactions, when a seller deposits a good with a common carrier, the buyer assumes possession of the good (the so-called "mailbox rule"), the Second Circuit concluded "that there is a difference between the criminal law of possession and the commercial law of possession and title," and that "[a] court will not pay deference to the niceties of title when the transaction involves contraband." *Id.* If the drug buyer did not collect the drugs, the drugs would have been returned to the defendant. *Id.* Therefore, "[the defendant] did not lose possession until the [drug package] was actually delivered" and venue therefore became proper at the place of delivery. *Id.*

23

This idea is especially true for a distribution offense like that with which Purks was charged, where possession "is not necessarily an element." *Randall*, 171 F.3d at 209. The question is not whether Purks had "possession" of the drugs in Virginia, but rather where he "beg[a]n, continued, or completed" the act of distribution. As courts look past "the niceties of title" when it comes to venue for a possession offense, *see Boney*, 572 F.2d at 401, we will likewise decline to import a mailbox rule to distribution offenses. This is consistent with this Court's reasoning in *Lowry* and with obscenity jurisprudence.[9]

Turning to the case at hand, we hold that all fourteen counts of distribution were completed for purposes of § 3237(a) in the Western District of Virginia. The distribution counts correspond to individual instances of Purks directing the distribution of methamphetamine to Rec's address in that jurisdiction. J.A. 761–852, 2777. It is true that law enforcement intercepted some of the packages before they arrived at Rec's address. *Id.* But § 802 criminalizes the "*attempted* transfer of a controlled substance," just as it criminalizes the actual transfer. 21 U.S.C. § 802(8) (emphasis added). And, all the seizures occurred in the Western District of Virginia. In each case, the intended recipient was in the Western District of Virginia, making that a proper venue.

---

[9] Section 3237(a)'s second sentence further reinforces this finding. It states: "Any offense involving the use of the mails[ or] transportation in interstate or foreign commerce . . . is a continuing offense and . . . may be . . . prosecuted in any district from, through, or into which such commerce, mail matter, or imported object . . . moves." Because the offense of distribution does not require either the use of the mails or the transportation of the drugs in interstate commerce, we do not rely on this sentence (rather than the general continuing violation sentence preceding it) for purposes of determining venue and leave the question of whether to apply the categorical approach to § 3237(a)'s second sentence for another day. But, the second sentence does provide helpful clarification on how Congress considers the transportation of contraband.

24

We affirm the district court's venue instruction.

IV.

The district court's denial of Purks's motion to suppress and the district court's

jury instruction on venue are

*AFFIRMED*.